(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TIMBS *v.* INDIANA

### CERTIORARI TO THE SUPREME COURT OF INDIANA

No. 17–1091.  Argued November 28, 2018—Decided February 20, 2019

Tyson Timbs pleaded guilty in Indiana state court to dealing in a controlled substance and conspiracy to commit theft.  At the time of Timbs's arrest, the police seized a Land Rover SUV Timbs had purchased for $42,000 with money he received from an insurance policy when his father died.  The State sought civil forfeiture of Timbs's vehicle, charging that the SUV had been used to transport heroin.  Observing that Timbs had recently purchased the vehicle for more than four times the maximum $10,000 monetary fine assessable against him for his drug conviction, the trial court denied the State's request. The vehicle's forfeiture, the court determined, would be grossly disproportionate to the gravity of Timbs's offense, and therefore unconstitutional under the Eighth Amendment's Excessive Fines Clause. The Court of Appeals of Indiana affirmed, but the Indiana Supreme Court reversed, holding that the Excessive Fines Clause constrains only federal action and is inapplicable to state impositions.

*Held*: The Eighth Amendment's Excessive Fines Clause is an incorporated protection applicable to the States under the Fourteenth Amendment's Due Process Clause.  Pp. 2–9.

   (a) The Fourteenth Amendment's Due Process Clause incorporates and renders applicable to the States Bill of Rights protections "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition."  *McDonald* v. *Chicago*, 561 U. S. 742, 767 (alterations omitted).  If a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires.  Pp. 2–3.

   (b) The prohibition embodied in the Excessive Fines Clause carries forward protections found in sources from Magna Carta to the English Bill of Rights to state constitutions from the colonial era to the present day.  Protection against excessive fines has been a constant

shield throughout Anglo-American history for good reason: Such fines undermine other liberties. They can be used, *e.g.*, to retaliate against or chill the speech of political enemies. They can also be employed, not in service of penal purposes, but as a source of revenue. The historical and logical case for concluding that the Fourteenth Amendment incorporates the Excessive Fines Clause is indeed overwhelming. Pp. 3–7.

(c) Indiana argues that the Clause does not apply to its use of civil *in rem* forfeitures, but this Court held in *Austin* v. *United States*, 509 U. S. 602, that such forfeitures fall within the Clause's protection when they are at least partially punitive. Indiana cannot prevail unless the Court overrules *Austin* or holds that, in light of *Austin*, the Excessive Fines Clause is not incorporated because its application to civil *in rem* forfeitures is neither fundamental nor deeply rooted.

The first argument, overturning *Austin*, is not properly before this Court. The Indiana Supreme Court held only that the Excessive Fines Clause did not apply to the States. The court did not address the Clause's application to civil *in rem* forfeitures, nor did the State ask it to do so. Timbs thus sought this Court's review only of the question whether the Excessive Fines Clause is incorporated by the Fourteenth Amendment. Indiana attempted to reformulate the question to ask whether the Clause restricted States' use of civil *in rem* forfeitures and argued on the merits that *Austin* was wrongly decided. Respondents' "right, . . . to restate the questions presented," however, "does not give them the power to expand [those] questions," *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 279, n. 10 (emphasis deleted), particularly where the proposed reformulation would lead the Court to address a question neither pressed nor passed upon below, cf. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7.

The second argument, that the Excessive Fines Clause cannot be incorporated if it applies to civil *in rem* forfeitures, misapprehends the nature of the incorporation inquiry. In considering whether the Fourteenth Amendment incorporates a Bill of Rights protection, this Court asks whether the right guaranteed—not each and every particular application of that right—is fundamental or deeply rooted. To suggest otherwise is inconsistent with the approach taken in cases concerning novel applications of rights already deemed incorporated. See, *e.g., Packingham* v. *North Carolina*, 582 U. S. ___, ___. The Excessive Fines Clause is thus incorporated regardless of whether application of the Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted. Pp. 7–9.

84 N. E. 3d 1179, vacated and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS,

Syllabus

C. J., and BREYER, ALITO, SOTOMAYOR, KAGAN, GORSUCH, and KA-
VANAUGH, JJ., joined. GORSUCH, J., filed a concurring opinion. THOMAS,
J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–1091

## TYSON TIMBS, PETITIONER *v.* INDIANA

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF INDIANA

[February 20, 2019]

JUSTICE GINSBURG delivered the opinion of the Court.

Tyson Timbs pleaded guilty in Indiana state court to dealing in a controlled substance and conspiracy to commit theft. The trial court sentenced him to one year of home detention and five years of probation, which included a court-supervised addiction-treatment program. The sentence also required Timbs to pay fees and costs totaling $1,203. At the time of Timbs's arrest, the police seized his vehicle, a Land Rover SUV Timbs had purchased for about $42,000. Timbs paid for the vehicle with money he received from an insurance policy when his father died.

The State engaged a private law firm to bring a civil suit for forfeiture of Timbs's Land Rover, charging that the vehicle had been used to transport heroin. After Timbs's guilty plea in the criminal case, the trial court held a hearing on the forfeiture demand. Although finding that Timbs's vehicle had been used to facilitate violation of a criminal statute, the court denied the requested forfeiture, observing that Timbs had recently purchased the vehicle for $42,000, more than four times the maximum $10,000 monetary fine assessable against him for his drug conviction. Forfeiture of the Land Rover, the court determined,

would be grossly disproportionate to the gravity of Timbs's offense, hence unconstitutional under the Eighth Amendment's Excessive Fines Clause. The Court of Appeals of Indiana affirmed that determination, but the Indiana Supreme Court reversed. 84 N. E. 3d 1179 (2017). The Indiana Supreme Court did not decide whether the forfeiture would be excessive. Instead, it held that the Excessive Fines Clause constrains only federal action and is inapplicable to state impositions. We granted certiorari. 585 U. S. __ (2018).

The question presented: Is the Eighth Amendment's Excessive Fines Clause an "incorporated" protection applicable to the States under the Fourteenth Amendment's Due Process Clause? Like the Eighth Amendment's proscriptions of "cruel and unusual punishment" and "[e]xcessive bail," the protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority. This safeguard, we hold, is "fundamental to our scheme of ordered liberty," with "dee[p] root[s] in [our] history and tradition." *McDonald* v. *Chicago*, 561 U. S. 742, 767 (2010) (internal quotation marks omitted; emphasis deleted). The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment.

I

A

When ratified in 1791, the Bill of Rights applied only to the Federal Government. *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243 (1833). "The constitutional Amendments adopted in the aftermath of the Civil War," however, "fundamentally altered our country's federal system." *McDonald*, 561 U. S., at 754. With only "a handful" of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them appli-

cable to the States. *Id.*, at 764–765, and nn. 12–13. A Bill of Rights protection is incorporated, we have explained, if it is "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition." *Id.,* at 767 (internal quotation marks omitted; emphasis deleted).

Incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." *Id.,* at 765 (internal quotation marks omitted). Thus, if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires.[1]

## B

Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Taken together, these Clauses place "parallel limitations" on "the power of those entrusted with the criminal-law function of government." *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 263 (1989) (quoting *Ingraham* v. *Wright*, 430 U. S. 651, 664 (1977)). Directly at issue here is the phrase "nor excessive fines imposed," which "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.'" *United States* v. *Bajakajian*, 524 U. S. 321, 327–328 (1998) (quot-

---

[1] The sole exception is our holding that the Sixth Amendment requires jury unanimity in federal, but not state, criminal proceedings. *Apodaca* v. *Oregon*, 406 U. S. 404 (1972). As we have explained, that "exception to th[e] general rule . . . was the result of an unusual division among the Justices," and it "does not undermine the well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government." *McDonald*, 561 U. S., at 766, n. 14.

ing *Austin* v. *United States*, 509 U. S. 602, 609–610 (1993)). The Fourteenth Amendment, we hold, incorporates this protection.

The Excessive Fines Clause traces its venerable lineage back to at least 1215, when Magna Carta guaranteed that "[a] Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement . . . ." §20, 9 Hen. III, ch. 14, in 1 Eng. Stat. at Large 5 (1225).[2] As relevant here, Magna Carta required that economic sanctions "be proportioned to the wrong" and "not be so large as to deprive [an offender] of his livelihood." *Browning-Ferris*, 492 U. S., at 271. See also 4 W. Blackstone, Commentaries on the Laws of England 372 (1769) ("[N]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear . . . ."). But cf. *Bajakajian*, 524 U. S., at 340, n. 15 (taking no position on the question whether a person's income and wealth are relevant considerations in judging the excessiveness of a fine).

Despite Magna Carta, imposition of excessive fines persisted. The 17th century Stuart kings, in particular, were criticized for using large fines to raise revenue, harass their political foes, and indefinitely detain those unable to pay. *E.g.*, The Grand Remonstrance ¶¶17, 34 (1641), in The Constitutional Documents of the Puritan Revolution 1625–1660, pp. 210, 212 (S. Gardiner ed., 3d ed. rev. 1906); *Browning-Ferris*, 492 U. S., at 267. When James II was overthrown in the Glorious Revolution, the

_____

[2] "Amercements were payments to the Crown, and were required of individuals who were 'in the King's mercy,' because of some act offensive to the Crown." *Browning-Ferris*, 492 U. S., at 269. "[T]hough fines and amercements had distinct historical antecedents, they served fundamentally similar purposes—and, by the seventeenth and eighteenth centuries, the terms were often used interchangeably." Brief for Eighth Amendment Scholars as *Amici Curiae* 12.

attendant English Bill of Rights reaffirmed Magna Carta's guarantee by providing that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." 1 Wm. & Mary, ch. 2, §10, in 3 Eng. Stat. at Large 441 (1689).

Across the Atlantic, this familiar language was adopted almost verbatim, first in the Virginia Declaration of Rights, then in the Eighth Amendment, which states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

Adoption of the Excessive Fines Clause was in tune not only with English law; the Clause resonated as well with similar colonial-era provisions. See, *e.g.*, Pa. Frame of Govt., Laws Agreed Upon in England, Art. XVIII (1682), in 5 Federal and State Constitutions 3061 (F. Thorpe ed. 1909) ("[A]ll fines shall be moderate, and saving men's contenements, merchandize, or wainage."). In 1787, the constitutions of eight States—accounting for 70% of the U. S. population—forbade excessive fines. Calabresi, Agudo, & Dore, State Bills of Rights in 1787 and 1791, 85 S. Cal. L. Rev. 1451, 1517 (2012).

An even broader consensus obtained in 1868 upon ratification of the Fourteenth Amendment. By then, the constitutions of 35 of the 37 States—accounting for over 90% of the U. S. population—expressly prohibited excessive fines. Calabresi & Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868, 87 Texas L. Rev. 7, 82 (2008).

Notwithstanding the States' apparent agreement that the right guaranteed by the Excessive Fines Clause was fundamental, abuses continued. Following the Civil War, Southern States enacted Black Codes to subjugate newly freed slaves and maintain the prewar racial hierarchy. Among these laws' provisions were draconian fines for violating broad proscriptions on "vagrancy" and other dubious offenses. See, *e.g.*, Mississippi Vagrant Law,

Laws of Miss. §2 (1865), in 1 W. Fleming, Documentary History of Reconstruction 283–285 (1950). When newly freed slaves were unable to pay imposed fines, States often demanded involuntary labor instead. *E.g.*, *id.* §5; see Finkelman, John Bingham and the Background to the Fourteenth Amendment, 36 Akron L. Rev 671, 681–685 (2003) (describing Black Codes' use of fines and other methods to "replicate, as much as possible, a system of involuntary servitude"). Congressional debates over the Civil Rights Act of 1866, the joint resolution that became the Fourteenth Amendment, and similar measures repeatedly mentioned the use of fines to coerce involuntary labor. See, *e.g.*, Cong. Globe, 39th Cong., 1st Sess., 443 (1866); *id.,* at 1123–1124.

Today, acknowledgment of the right's fundamental nature remains widespread. As Indiana itself reports, all 50 States have a constitutional provision prohibiting the imposition of excessive fines either directly or by requiring proportionality. Brief in Opposition 8–9. Indeed, Indiana explains that its own Supreme Court has held that the Indiana Constitution should be interpreted to impose the same restrictions as the Eighth Amendment. *Id.*, at 9 (citing *Norris* v. *State*, 271 Ind. 568, 576, 394 N. E. 2d 144, 150 (1979)).

For good reason, the protection against excessive fines has been a constant shield throughout Anglo-American history: Exorbitant tolls undermine other constitutional liberties. Excessive fines can be used, for example, to retaliate against or chill the speech of political enemies, as the Stuarts' critics learned several centuries ago. See *Browning-Ferris*, 492 U. S., at 267. Even absent a political motive, fines may be employed "in a measure out of accord with the penal goals of retribution and deterrence," for "fines are a source of revenue," while other forms of punishment "cost a State money." *Harmelin* v. *Michigan*, 501 U. S. 957, 979, n. 9 (1991) (opinion of Scalia, J.) ("it

makes sense to scrutinize governmental action more closely when the State stands to benefit"). This concern is scarcely hypothetical. See Brief for American Civil Liberties Union et al. as *Amici Curiae* 7 ("Perhaps because they are politically easier to impose than generally applicable taxes, state and local governments nationwide increasingly depend heavily on fines and fees as a source of general revenue.").

In short, the historical and logical case for concluding that the Fourteenth Amendment incorporates the Excessive Fines Clause is overwhelming. Protection against excessive punitive economic sanctions secured by the Clause is, to repeat, both "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *McDonald*, 561 U. S., at 767 (internal quotation marks omitted; emphasis deleted).

## II

The State of Indiana does not meaningfully challenge the case for incorporating the Excessive Fines Clause as a general matter. Instead, the State argues that the Clause does not apply to its use of civil *in rem* forfeitures because, the State says, the Clause's specific application to such forfeitures is neither fundamental nor deeply rooted.

In *Austin* v. *United States*, 509 U. S. 602 (1993), however, this Court held that civil *in rem* forfeitures fall within the Clause's protection when they are at least partially punitive. *Austin* arose in the federal context. But when a Bill of Rights protection is incorporated, the protection applies "identically to both the Federal Government and the States." *McDonald*, 561 U. S., at 766, n. 14. Accordingly, to prevail, Indiana must persuade us either to overrule our decision in *Austin* or to hold that, in light of *Austin*, the Excessive Fines Clause is not incorporated because the Clause's application to civil *in rem* forfeitures is neither fundamental nor deeply rooted. The first argument is not

properly before us, and the second misapprehends the nature of our incorporation inquiry.

## A

In the Indiana Supreme Court, the State argued that forfeiture of Timbs's SUV would not be excessive. See Brief in Opposition 5. It never argued, however, that civil *in rem* forfeitures were categorically beyond the reach of the Excessive Fines Clause. The Indiana Supreme Court, for its part, held that the Clause did not apply to the States at all, and it nowhere addressed the Clause's application to civil *in rem* forfeitures. See 84 N. E. 3d 1179. Accordingly, Timbs sought our review of the question "[w]hether the Eighth Amendment's Excessive Fines Clause is incorporated against the States under the Fourteenth Amendment." Pet. for Cert. i. In opposing review, Indiana attempted to reformulate the question to ask "[w]hether the Eighth Amendment's Excessive Fines Clause restricts States' use of civil asset forfeitures." Brief in Opposition i. And on the merits, Indiana has argued not only that the Clause is not incorporated, but also that *Austin* was wrongly decided. Respondents' "right, in their brief in opposition, to restate the questions presented," however, "does not give them the power to expand [those] questions." *Bray* v. *Alexandria Women's Health Clinic*, 506 U. S. 263, 279, n. 10 (1993) (emphasis deleted). That is particularly the case where, as here, a respondent's reformulation would lead us to address a question neither pressed nor passed upon below. Cf. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) ("[W]e are a court of review, not of first view . . . ."). We thus decline the State's invitation to reconsider our unanimous judgment in *Austin* that civil *in rem* forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive.

## B

As a fallback, Indiana argues that the Excessive Fines Clause cannot be incorporated if it applies to civil *in rem* forfeitures. We disagree. In considering whether the Fourteenth Amendment incorporates a protection contained in the Bill of Rights, we ask whether the right guaranteed—not each and every particular application of that right—is fundamental or deeply rooted.

Indiana's suggestion to the contrary is inconsistent with the approach we have taken in cases concerning novel applications of rights already deemed incorporated. For example, in *Packingham* v. *North Carolina*, 582 U. S. \_\_\_ (2017), we held that a North Carolina statute prohibiting registered sex offenders from accessing certain commonplace social media websites violated the First Amendment right to freedom of speech. In reaching this conclusion, we noted that the First Amendment's Free Speech Clause was "applicable to the States under the Due Process Clause of the Fourteenth Amendment." *Id.,* at \_\_\_ (slip op., at 1). We did not, however, inquire whether the Free Speech Clause's application specifically to social media websites was fundamental or deeply rooted. See also, *e.g., Riley* v. *California*, 573 U. S. 373 (2014) (holding, without separately considering incorporation, that States' warrantless search of digital information stored on cell phones ordinarily violates the Fourth Amendment). Similarly here, regardless of whether application of the Excessive Fines Clause to civil *in rem* forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged.

\*    \*    \*

For the reasons stated, the judgment of the Indiana Supreme Court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 17–1091

### TYSON TIMBS, PETITIONER *v.* INDIANA

ON WRIT OF CERTIORARI TO THE SUPREME
COURT OF INDIANA

[February 20, 2019]

JUSTICE GORSUCH, concurring.

The majority faithfully applies our precedent and, based on a wealth of historical evidence, concludes that the Fourteenth Amendment incorporates the Eighth Amendment's Excessive Fines Clause against the States. I agree with that conclusion. As an original matter, I acknowledge, the appropriate vehicle for incorporation may well be the Fourteenth Amendment's Privileges or Immunities Clause, rather than, as this Court has long assumed, the Due Process Clause. See, *e.g.*, *post*, at 1–3 (THOMAS, J., concurring in judgment); *McDonald* v. *Chicago*, 561 U. S. 742, 805–858 (2010) (THOMAS, J., concurring in part and concurring in judgment) (documenting evidence that the "privileges or immunities of citizens of the United States" include, at minimum, the individual rights enumerated in the Bill of Rights); Wildenthal, Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866–67, 68 Ohio St. L. J. 1509 (2007); A. Amar, The Bill of Rights: Creation and Reconstruction 163–214 (1998); M. Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights (1986). But nothing in this case turns on that question, and, regardless of the precise vehicle, there can be no serious doubt that the Fourteenth Amendment requires the States to respect the freedom from excessive fines enshrined in the Eighth Amendment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–1091

_____

## TYSON TIMBS, PETITIONER *v.* INDIANA

ON WRIT OF CERTIORARI TO THE SUPREME
COURT OF INDIANA

[February 20, 2019]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that the Fourteenth Amendment makes the Eighth Amendment's prohibition on excessive fines fully applicable to the States. But I cannot agree with the route the Court takes to reach this conclusion. Instead of reading the Fourteenth Amendment's Due Process Clause to encompass a substantive right that has nothing to do with "process," I would hold that the right to be free from excessive fines is one of the "privileges or immunities of citizens of the United States" protected by the Fourteenth Amendment.

I

The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." "On its face, this appears to grant . . . United States citizens a certain collection of rights—*i.e.*, privileges or immunities—attributable to that status." *McDonald* v. *Chicago*, 561 U. S. 742, 808 (2010) (THOMAS, J., concurring in part and concurring in judgment). But as I have previously explained, this Court "marginaliz[ed]" the Privileges or Immunities Clause in the late 19th century by defining the collection of rights covered by the Clause "quite narrowly." *Id.*, at 808–809. Litigants seeking federal protection of substantive rights against the States thus needed

"an alternative fount of such rights," and this Court "found one in a most curious place," *id.*, at 809—the Fourteenth Amendment's Due Process Clause, which prohibits "any State" from "depriv[ing] any person of life, liberty, or property, without due process of law."

Because this Clause speaks only to "process," the Court has "long struggled to define" what substantive rights it protects. *McDonald*, *supra*, at 810 (opinion of THOMAS, J.). The Court ordinarily says, as it does today, that the Clause protects rights that are "fundamental." *Ante*, at 2, 3, 7, 9. Sometimes that means rights that are "'deeply rooted in this Nation's history and tradition.'" *Ante*, at 3, 7 (quoting *McDonald*, *supra*, at 767 (majority opinion)). Other times, when that formulation proves too restrictive, the Court defines the universe of "fundamental" rights so broadly as to border on meaningless. See, *e.g.*, *Obergefell* v. *Hodges*, 576 U. S. ___, ___–___ (2015) (slip op., at 1–2) ("rights that allow persons, within a lawful realm, to define and express their identity"); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 851 (1992) ("At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life"). Because the oxymoronic "substantive" "due process" doctrine has no basis in the Constitution, it is unsurprising that the Court has been unable to adhere to any "guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not." *McDonald*, *supra*, at 811 (opinion of THOMAS, J.). And because the Court's substantive due process precedents allow the Court to fashion fundamental rights without any textual constraints, it is equally unsurprising that among these precedents are some of the Court's most notoriously incorrect decisions. *E.g.*, *Roe* v. *Wade*, 410 U. S. 113 (1973); *Dred Scott* v. *Sandford*, 19 How. 393, 450 (1857).

The present case illustrates the incongruity of the

Court's due process approach to incorporating fundamental rights against the States. Petitioner argues that the forfeiture of his vehicle is an excessive punishment. He does not argue that the Indiana courts failed to "'proceed according to the "law of the land"—that is, according to written constitutional and statutory provisions,'" or that the State failed to provide "some baseline procedures." *Nelson* v. *Colorado*, 581 U. S. \_\_\_, \_\_\_, n. 1 (2017) (THOMAS, J., dissenting) (slip op., at 2, n. 1). His claim has nothing to do with any "process" "due" him. I therefore decline to apply the "legal fiction" of substantive due process. *McDonald*, 561 U. S., at 811 (opinion of THOMAS, J.).

## II

When the Fourteenth Amendment was ratified, "the terms 'privileges' and 'immunities' had an established meaning as synonyms for 'rights.'" *Id.*, at 813. Those "rights" were the "inalienable rights" of citizens that had been "long recognized," and "the ratifying public understood the Privileges or Immunities Clause to protect constitutionally enumerated rights" against interference by the States. *Id.*, at 822, 837. Many of these rights had been adopted from English law into colonial charters, then state constitutions and bills of rights, and finally the Constitution. "Consistent with their English heritage, the founding generation generally did not consider many of the rights identified in [the Bill of Rights] as new entitlements, but as inalienable rights of all men, given legal effect by their codification in the Constitution's text." *Id.*, at 818.

The question here is whether the Eighth Amendment's prohibition on excessive fines was considered such a right. The historical record overwhelmingly demonstrates that it was.

### A

The Excessive Fines Clause "was taken verbatim from the English Bill of Rights of 1689," *United States* v. *Bajakajian*, 524 U. S. 321, 335 (1998), which itself formalized a longstanding English prohibition on disproportionate fines. The Charter of Liberties of Henry I, issued in 1101, stated that "[i]f any of my barons or men shall have committed an offence he shall not give security to the extent of forfeiture of his money, as he did in the time of my father, or of my brother, but *according to the measure of the offence so shall he pay . . . .*" Sources of English Legal and Constitutional History ¶8, p. 50 (M. Evans & R. Jack eds. 1984) (emphasis added). Expanding this principle, Magna Carta required that "amercements (the medieval predecessors of fines) should be proportioned to the offense and that they should not deprive a wrongdoer of his livelihood," *Bajakajian*, *supra*, at 335:

> "A free man shall be amerced for a small fault only according to the measure thereof, and for a great crime according to its magnitude, saving his position; and in like manner, a merchant saving his trade, and a villein saving his tillage, if they should fall under Our mercy." Magna Carta, ch. 20 (1215), in A. Howard, Magna Carta: Text & Commentary 42 (rev. ed. 1998).

Similar clauses levying amercements "only in proportion to the measure of the offense" applied to earls, barons, and clergymen. Chs. 21–22, *ibid.* One historian posits that, due to the prevalence of amercements and their use in increasing the English treasury, "[v]ery likely there was no clause in Magna Carta more grateful to the mass of the people than that about amercements." Pleas of the Crown for the County of Gloucester xxxiv (F. Maitland ed. 1884).

The principle was reiterated in the First Statute of Westminster, which provided that no man should "be amerced, without reasonable cause, and according to the

quantity of his Trespass." 3 Edw. I, ch. 6 (1275). The English courts have long enforced this principle. In one early case, for example, the King commanded the bailiff "to take a moderate amercement proper to the magnitude and manner of th[e] offense, according to the tenour of the Great Charter of the Liberties of England," and the bailiff was sued for extorting "a heavier ransom." *Le Gras* v. *Bailiff of Bishop of Winchester*, Y. B. Mich. 10 Edw. II, pl. 4 (1316), reprinted in 52 Selden Society 3, 5 (1934); see also *Richard Godfrey's Case*, 11 Co. Rep. 42a, 44a, 77 Eng. Rep. 1199, 1202 (1615) (excessive fines are "against law").

During the reign of the Stuarts in the period leading up to the Glorious Revolution of 1688–1689, fines were a flashpoint "in the constitutional and political struggles between the king and his parliamentary critics." L. Schwoerer, The Declaration of Rights, 1689, p. 91 (1981) (Schwoerer). From 1629 to 1640, Charles I attempted to govern without convening Parliament, but "in the absence of parliamentary grants," he needed other ways of raising revenue. 4 H. Walter, A History of England 135 (1834); see 1 T. Macaulay, History of England 85 (1899). He thus turned "to exactions, some odious and obsolete, some of very questionable legality, and others clearly against law." 1 H. Hallam, Constitutional History of England: From the Accession of Henry VII to the Death of George II 462 (1827) (Hallam); see 4 Walter, *supra*, at 135.

The Court of Star Chamber, for instance, "imposed heavy fines on the king's enemies," Schwoerer 91, in disregard "of the provision of the Great Charter, that no man shall be amerced even to the full extent of his means. . . ." 2 Hallam 46–47. "[T]he strong interest of th[is] court in these fines . . . had a tendency to aggravate the punishment. . . ." 1 *id.*, at 490. "The statute abolishing" the Star Chamber in 1641 "specifically prohibited any court thereafter from . . . levying . . . excessive fines." Schwoerer 91.

"But towards the end of Charles II's reign" in the 1670s

and early 1680s, courts again "imposed ruinous fines on the critics of the crown." *Ibid.* In 1680, a committee of the House of Commons "examined the transcripts of all the fines imposed in King's Bench since 1677" and found that "the Court of King's Bench, in the Imposition of Fines on Offenders of late Years, hath acted arbitrarily, illegally, and partially; favouring Papists and Persons popishly affected; and excessively oppressing his Majesty's Protestant Subjects." *Ibid.*; 9 Journals of the House of Commons 692 (Dec. 23, 1680). The House of Commons determined that the actions of the judges of the King's Bench, particularly the actions of Chief Justice William Scroggs, had been so contrary to law that it prepared articles of impeachment against him. The articles alleged that Scroggs had "most notoriously departed from all Rules of Justice and Equality, in the Imposition of Fines upon Persons convicted of Misdemeanors" without "any Regard to the Nature of the Offences, or the Ability of the Persons." *Id.*, at 698.

Yet "[o]ver the next few years fines became even more excessive and partisan." Schwoerer 91. The King's Bench, presided over by the infamous Chief Justice Jeffreys, fined Anglican cleric Titus Oates 2,000 marks (among other punishments) for perjury. *Id.*, at 93. For speaking against the Duke of York, the sheriff of London was fined £100,000 in 1682, which corresponds to well over $10 million in present-day dollars[1]—"an amount, which, as it extended to the ruin of the criminal, was directly contrary to the spirit of [English] law." The History of England Under the House of Stuart, pt. 2, p. 801 (1840). The King's Bench fined Sir Samuel Barnadiston £10,000 for allegedly seditious letters, a fine that was overturned by the House of

---

[1] See Currency Converter: 1270–2017 (estimating the 2017 equivalent of £100,000 in 1680), http://nationalarchives.gov.uk/currency-converter (as last visited Feb. 8, 2019)

Lords as "exorbitant and excessive." 14 Journals of the House of Lords 210 (May 14, 1689). Several members of the committees that would draft the Declaration of Rights—which included the prohibition on excessive fines that was enacted into the English Bill of Rights of 1689—had themselves "suffered heavy fines." Schwoerer 91–92. And in 1684, judges in the case of John Hampden held that Magna Carta did not limit "fines for great offences" against the King, and imposed a £40,000 fine. *Trial of Hampden*, 9 State Trials 1054, 1125 (K. B. 1684); 1 J. Stephen, A History of the Criminal Law of England 490 (1883).

"Freedom from excessive fines" was considered "indisputably an ancient right of the subject," and the Declaration of Rights' indictment against James II "charged that during his reign judges had imposed excessive fines, thereby subverting the laws and liberties of the kingdom." Schwoerer 90. Article 10 of the Declaration declared "[t]hat excessive Bayle ought not to be required nor excessive fynes imposed nor cruel and unusuall Punishments inflicted." *Id.*, at 297.

Shortly after the English Bill of Rights was enacted, Parliament addressed several excessive fines imposed before the Glorious Revolution. For example, the House of Lords overturned a £30,000 fine against the Earl of Devonshire as "excessive and exorbitant, against Magna Charta, the common right of the subject, and against the law of the land." *Case of Earl of Devonshire*, 11 State Trials 1354, 1372 (K. B. 1687). Although the House of Lords refused to reverse the judgments against Titus Oates, a minority argued that his punishments were "contrary to Law and ancient Practice" and violated the prohibition on "excessive Fines." *Harmelin* v. *Michigan*, 501 U. S. 957, 971 (1991); *Trial of Oates*, 10 State Trials 1080, 1325 (K. B. 1685). The House of Commons passed a bill to overturn Oates's conviction, and eventually, after a

request from Parliament, the King pardoned Oates. *Id.*, at 1329–1330.

Writing a few years before our Constitution was adopted, Blackstone—"whose works constituted the preeminent authority on English law for the founding generation," *Alden* v. *Maine*, 527 U. S. 706, 715 (1999)—explained that the prohibition on excessive fines contained in the English Bill of Rights "had a retrospect to some unprecedented proceedings in the court of king's bench." 4 W. Blackstone, Commentaries 372 (1769). Blackstone confirmed that this prohibition was "only declaratory . . . of the old constitutional law of the land," which had long "regulated" the "discretion" of the courts in imposing fines. *Ibid.*

In sum, at the time of the founding, the prohibition on excessive fines was a longstanding right of Englishmen.

B

"As English subjects, the colonists considered themselves to be vested with the same fundamental rights as other Englishmen," *McDonald*, 561 U. S., at 816 (opinion of THOMAS, J.), including the prohibition on excessive fines. *E.g.*, J. Dummer, A Defence of the New-England Charters 16–17 (1721) ("The Subjects Abroad claim the Privilege of *Magna Charta*, which says that no Man shall be fin'd above the Nature of his Offence, and whatever his Miscarriage be, a *Salvo Contenemento suo* is to be observ'd by the Judge"). Thus, the text of the Eighth Amendment was "'based directly on . . . the Virginia Declaration of Rights,' which 'adopted verbatim the language of the English Bill of Rights.'" *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 266 (1989) (quoting *Solem* v. *Helm*, 463 U. S. 277, 285, n. 10 (1983)); see *Jones* v. *Commonwealth*, 5 Va. 555, 557 (1799) (opinion of Carrington, J.) (explaining that the clause in the Virginia Declaration of Rights embodied the traditional legal understanding that any "fine or amercement ought

to be according to the degree of the fault and the estate of the defendant").

When the States were considering whether to ratify the Constitution, advocates for a separate bill of rights emphasized the need for an explicit prohibition on excessive fines mirroring the English prohibition. In colonial times, fines were "the drudge-horse of criminal justice," "probably the most common form of punishment." L. Friedman, Crime and Punishment in American History 38 (1993). To some, this fact made a constitutional prohibition on excessive fines all the more important. As the well-known Anti-Federalist Brutus argued in an essay, a prohibition on excessive fines was essential to "the security of liberty" and was "as necessary under the general government as under that of the individual states; for the power of the former is as complete to the purpose of requiring bail, imposing fines, inflicting punishments, . . . and seizing . . . property . . . as the other." Brutus II (Nov. 1, 1787), in The Complete Bill of Rights 621 (N. Cogan ed. 1997). Similarly, during Virginia's ratifying convention, Patrick Henry pointed to Virginia's own prohibition on excessive fines and said that it would "depart from the genius of your country" for the Federal Constitution to omit a similar prohibition. Debate on Virginia Convention (June 14, 1788), in 3 Debates on the Federal Constitution 447 (J. Elliot 2d ed. 1854). Henry continued: "[W]hen we come to punishments, no latitude ought to be left, nor dependence put on the virtue of representatives" to "define punishments without this control." *Ibid.*

Governor Edmund Randolph responded to Henry, arguing that Virginia's charter was "nothing more than an investiture, in the hands of the Virginia citizens, of those rights which belonged to British subjects." *Id.*, at 466. According to Randolph, "the exclusion of excessive bail and fines . . . would follow of itself without a bill of rights," for such fines would never be imposed absent "corruption in

the House of Representatives, Senate, and President," or
judges acting "contrary to justice." *Id.*, at 467–468.

For all the debate about whether an explicit prohibition
on excessive fines was necessary in the Federal Constitu-
tion, all agreed that the prohibition on excessive fines was
a well-established and fundamental right of citizenship.
When the Excessive Fines Clause was eventually consid-
ered by Congress, it received hardly any discussion before
"it was agreed to by a considerable majority." 1 Annals of
Cong. 754 (1789). And when the Bill of Rights was rati-
fied, most of the States had a prohibition on excessive
fines in their constitutions.[2]

Early commentary on the Clause confirms the wide-
spread agreement about the fundamental nature of the
prohibition on excessive fines. Justice Story, writing a few
decades before the ratification of the Fourteenth Amend-
ment, explained that the Eighth Amendment was "adopted,
as an admonition to all departments of the national
government, to warn them against such violent proceed-
ings, as had taken place in England in the arbitrary reigns
of some of the Stuarts," when "[e]normous fines and
amercements were . . . sometimes imposed." 3 J. Story,
Commentaries on the Constitution of the United States
§1896, pp. 750–751 (1833). Story included the prohibition

——————
[2] Del. Const., Art. I, §11 (1792), in 1 Federal and State Constitutions
569 (F. Thorpe ed. 1909); Md. Const., Decl. of Rights, Art. XXII (1776),
in 3 *id.*, at 1688; Mass. Const., pt. 1, Art. XXVI (1780), in *id.*, at 1892;
N. H. Const., pt. 1, Art. 1, §XXXIII (1784), in 4 *id.*, at 2457; N. C.
Const., Decl. of Rights, Art. X (1776), in 5 *id.*, at 2788; Pa. Const., Art.
IX, §13 (1790), in *id.*, at 3101; S. C. Const., Art. IX, §4 (1790), in 6 *id.*,
at 3264; Va. Const., Bill of Rights, §9 (1776), in 7 *id.*, at 3813. Vermont
had a clause specifying that "all fines shall be proportionate to the
offences." Vt. Const., ch. II, §XXIX (1786), in *id.*, at 3759. Georgia's
1777 Constitution had an excessive fines clause, Art. LIX, but its 1789
Constitution did not. And the Northwest Ordinance provided that "[a]ll
fines shall be moderate; and no cruel or unusual punishments inflicted."
§14, Art. 2 (1787)

on excessive fines as a right, along with the "right to bear arms" and others protected by the Bill of Rights, that "operates, as a qualification upon powers, actually granted by the people to the government"; without such a "restrict[ion]," the government's "exercise or abuse" of its power could be "dangerous to the people." *Id.*, §1858, at 718–719.

Chancellor Kent likewise described the Eighth Amendment as part of the "right of personal security . . . guarded by provisions which have been transcribed into the constitutions in this country from *magna carta*, and other fundamental acts of the English Parliament." 2 J. Kent, Commentaries on American Law 9 (1827). He understood the Eighth Amendment to "guard against abuse and oppression," and emphasized that "the constitutions of almost every state in the Unio[n] contain the same declarations in substance, and nearly in the same language." *Ibid.* Accordingly, "they must be regarded as fundamental doctrines in every state, for all the colonies were parties to the national declaration of rights in 1774, in which the . . . rights and liberties of English subjects were peremptorily claimed as their undoubted inheritance and birthright." *Ibid.*; accord, W. Rawle, A View of the Constitution of the United States of America 125 (1825) (describing the prohibition on excessive fines as "founded on the plainest principles of justice").

C

The prohibition on excessive fines remained fundamental at the time of the Fourteenth Amendment. In 1868, 35 of 37 state constitutions "expressly prohibited excessive fines." *Ante*, at 5. Nonetheless, as the Court notes, abuses of fines continued, especially through the Black Codes adopted in several States. *Ante*, at 5–6. The "centerpiece" of the Codes was their "attempt to stabilize the black work force and limit its economic options apart from plantation

labor." E. Foner, Reconstruction: America's Unfinished Revolution 1863–1877, p. 199 (1988). Under the Codes, "the state would enforce labor agreements and plantation discipline, punish those who refused to contract, and prevent whites from competing among themselves for black workers." *Ibid.* The Codes also included "'antienticement' measures punishing anyone offering higher wages to an employee already under contract." *Id.*, at 200.

The 39th Congress focused on these abuses during its debates over the Fourteenth Amendment, the Civil Rights Act of 1866, and the Freedmen's Bureau Act. During those well-publicized debates, Members of Congress consistently highlighted and lamented the "severe penalties" inflicted by the Black Codes and similar measures, Cong. Globe, 39th Cong., 1st Sess., 474 (1866) (Sen. Trumbull), suggesting that the prohibition on excessive fines was understood to be a basic right of citizenship.

For example, under Mississippi law, adult "freedmen, free negroes and mulattoes" "without lawful employment" faced $50 in fines and 10 days' imprisonment for vagrancy. Reports of Assistant Commissioners of Freedmen, and Synopsis of Laws on Persons of Color in Late Slave States, S. Exec. Doc. No. 6, 39th Cong., 2d Sess., §2, p. 192 (1867). Those convicted had five days to pay or they would be arrested and leased to "any person who will, for the shortest period of service, pay said fine and forfeiture and all costs." §5, *ibid.* Members of Congress criticized such laws "for selling [black] men into slavery in punishment of crimes of the slightest magnitude." Cong. Globe, 39th Cong., 1st Sess., 1123 (1866) (Rep. Cook); see *id.*, at 1124 ("It is idle to say these men will be protected by the States").

Similar examples abound. One congressman noted that Alabama's "aristocratic and anti-republican laws, almost reenacting slavery, among other harsh inflictions impose . . . a fine of fifty dollars and six months' imprisonment on

any servant or laborer (white or black) who loiters away his time or is stubborn or refractory." *Id.*, at 1621 (Rep. Myers). He also noted that Florida punished vagrants with "a fine not exceeding $500 and imprison[ment] for a term not exceeding twelve months, or by being sold for a term not exceeding twelve months, at the discretion of the court." *Ibid.* At the time, such fines would have been ruinous for laborers. Cf. *id.*, at 443 (Sen. Howe) ("A thousand dollars! That sells a negro for his life").

These and other examples of excessive fines from the historical record informed the Nation's consideration of the Fourteenth Amendment. Even those opposed to civil-rights legislation understood the Privileges or Immunities Clause to guarantee those "fundamental principles" "fixed" by the Constitution, including "immunity from . . . excessive fines." 2 Cong. Rec. 384–385 (1874) (Rep. Mills); see also *id.*, at App. 241 (Sen. Norwood). And every post-1855 state constitution banned excessive fines. S. Calabresi & S. Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868, 87 Texas L. Rev. 7, 82 (2008). The attention given to abusive fines at the time of the Fourteenth Amendment, along with the ubiquity of state excessive-fines provisions, demonstrates that the public continued to understand the prohibition on excessive fines to be a fundamental right of American citizenship.

\*     \*     \*

The right against excessive fines traces its lineage back in English law nearly a millennium, and from the founding of our country, it has been consistently recognized as a core right worthy of constitutional protection. As a constitutionally enumerated right understood to be a privilege of American citizenship, the Eighth Amendment's prohibition on excessive fines applies in full to the States.