[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. O'Malley*, Slip Opinion No. 2022-Ohio-3207.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3207

THE STATE OF OHIO, APPELLEE, *v*. O'MALLEY, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. O'Malley*, Slip Opinion No. 2022-Ohio-3207.]**

*Constitutional law—Equal protection—Excessive fines—R.C. 4511.19(G)(1)(c)(v)—Statute requiring forfeiture of an offender's vehicle following a third conviction for operating a vehicle while intoxicated does not violate Equal Protection Clause of either the Ohio or federal Constitution—Forfeiture of appellant's vehicle was not an unconstitutionally excessive fine under the Excessive Fines Clause of the Eighth Amendment to the United States Constitution—Judgment affirmed.*

(No. 2020-0859—Submitted May 12, 2021—Decided September 15, 2022.)

APPEAL from the Court of Appeals for Medina County,

No. 19CA0032-M, 2020-Ohio-3141.

_____

**FISCHER, J.**

{¶ 1} In this case, we are asked two separate questions about R.C. 4511.19(G)(1)(c)(v) and Ohio's criminal-forfeiture scheme for vehicles owned and used by repeat drunk drivers. First, we are asked whether that scheme violates the Equal Protection Clauses in the state and federal Constitutions by treating owners and nonowners differently. Next, we are asked, more specifically, whether the forfeiture of appellant James O'Malley's 2014 Chevrolet Silverado constituted an excessive fine in violation of the Eighth Amendment to the United States Constitution. We find that there was no equal-protection violation and that, as applied to O'Malley, the vehicle forfeiture mandated by R.C. 4511.19(G)(1)(c)(v) did not violate the Excessive Fines Clause of the Eighth Amendment because it was not grossly disproportional to the gravity of his offense. Accordingly, we affirm the judgment of the Ninth District Court of Appeals affirming the trial court's forfeiture order.

## I. BACKGROUND

### A. O'Malley is found guilty of his third OVI in ten years

{¶ 2} In the early morning hours of July 4, 2018, an Ohio State Highway Patrol trooper pulled O'Malley over for suspected drunk driving. When the trooper asked O'Malley for his license, O'Malley gave his credit card. The trooper then asked for O'Malley's address, but O'Malley was unable to provide it. O'Malley was arrested for operating a vehicle while intoxicated ("OVI").

{¶ 3} O'Malley was charged in the Medina County Municipal Court with one count of OVI for operating his vehicle in violation of R.C. 4511.19(A)(1)(a), one count of refusing to submit to chemical testing in violation of R.C. 4511.19(A)(2), and one count of failing to drive within marked lanes in violation of R.C. 4511.33. Because O'Malley had two prior OVI convictions within the preceding ten years, his 2014 Chevrolet Silverado truck was seized pending the completion of forfeiture proceedings under R.C. 4503.234.

{¶ 4} O'Malley subsequently entered a plea of no contest to the OVI charge, R.C. 4511.19(A)(1), and the trial court found him guilty of that offense. The remaining charges were dismissed.

### B. The trial court orders O'Malley to forfeit his vehicle

{¶ 5} The trial court held a forfeiture hearing pursuant to R.C. 4503.234 prior to sentencing. At the hearing, O'Malley argued that R.C. 4511.19(G)(1)(c)(v) violates equal protection by imposing a potential vehicle forfeiture against persons who own the vehicle involved in their OVI offense but not imposing that penalty against those who do not own the vehicle involved in the OVI offense. O'Malley also asserted that the forfeiture would be excessive under the Eighth Amendment. The court rejected both arguments.

{¶ 6} The trial court found that the distinction in punishment between owners and nonowners of vehicles involved in OVIs was rationally related to the state's legitimate penal goals. The court noted that in addition to the forfeiture requirement in R.C. 4511.19(G)(1)(c)(v) for vehicle owners with two prior OVI convictions within ten years of the third offense, the General Assembly had enacted a similar forfeiture requirement in R.C. 4511.203 for a vehicle owner who on multiple occasions wrongfully entrusted his or her vehicle to *another person* who then drove that vehicle while impaired. The existence of R.C. 4511.203, the court found, supported the reasonable distinctions between owners and nonowners—the goal was to keep impaired drivers off the road, and preventing their access to vehicles promotes that goal. Additionally, because the forfeiture penalty in R.C. 4511.19(G)(1)(c)(v) targets repeat offenders and is used as a deterrent against the owners of those vehicles, the means and method used by the state to further its interest survived rational-basis scrutiny.

{¶ 7} The trial court also determined that the forfeiture of O'Malley's vehicle would not be grossly disproportionate to the offense. The court used a multifactor test, weighing the harshness of the forfeiture against the culpability of

3

the defendant, the gravity of the offense, the relationship between the property and the crime, and the harm to the community.

{¶ 8} The trial court recognized that this was O'Malley's third drunk-driving offense in ten years and that the vehicle was "the very medium" by which the offense was committed. The court focused on O'Malley's culpability, acknowledging O'Malley's prior alcohol-related convictions and remarking that there was an "inarguably higher" risk of reoffending.

{¶ 9} The court understood that O'Malley's Silverado truck was purchased by his grandparents in 2014 and was essentially gifted to him in 2015, less $5,000 that O'Malley had put toward the original purchase of the vehicle. The court found the vehicle's value to be around $31,000, which was roughly 11 times greater than the maximum fine for O'Malley's offense under R.C. 4511.19.

{¶ 10} In considering the hardship on O'Malley, the trial court did not believe that the forfeiture would significantly affect him. While O'Malley had used the vehicle for transportation to and from work, he was unemployed at the time of the forfeiture hearing. Though O'Malley stated that he would seek employment even with a license suspension, he then admitted that he was not currently searching for employment and had "[given] it a break" because of his situation. And though O'Malley had used the vehicle to help his grandparents, he told the court that his grandmother would rather see him unemployed and helping out at home than transport him to and from a low-paying job. Additionally, the court found that O'Malley had "enjoyed a stable standard of living without employment for at least a 10-month period" and that the loss of his most recent job had "neither * * * impaired his living accommodations nor motivated him to find alternate employment." The court also noted that O'Malley did not have obligations to a spouse, children, or any other person and was living without notable living expenses.

**{¶ 11}** The court acknowledged that O'Malley had not harmed any person or property when he decided to drive drunk but found that "the potential for such harm, particularly for repeat offenders like [O'Malley], remains great." The court believed that O'Malley had been "very intoxicated" and had "placed the driving public at grave risk." Under the circumstances, the court found that it was fortunate O'Malley had been pulled over. It further explained that O'Malley's "combination of impulsiveness and impairment demands attention" and that the risks of his reoffending and remaining a danger to the community were higher given his track record.

**{¶ 12}** Though the court deemed the monetary value of the vehicle relevant, it was not enough to persuade the court that the forfeiture would indeed be an excessive penalty. The court ultimately found that O'Malley had not demonstrated by a preponderance of the evidence that the forfeiture of his vehicle would amount to an unconstitutionally excessive fine or disproportionate penalty. The court ordered O'Malley to forfeit his vehicle and then proceeded to sentencing.

**{¶ 13}** During sentencing, defense counsel emphasized that O'Malley had entered a plea and knew he was going to be placed on probation by the court. Defense counsel also indicated that O'Malley had corrected course by regularly attending Alcoholics Anonymous meetings and that he had enrolled in and graduated from an "intensive outpatient program." Additionally, O'Malley apologized for his actions.

**{¶ 14}** The trial court recognized that the purpose of sentencing for a misdemeanor offense is to "[p]unish the offender and protect the public." Acknowledging O'Malley's string of legal problems resulting from his use of alcohol over the previous decade, the court expressed its belief that O'Malley likely had a problem with alcohol and that it was good that he was taking action to "get [his] arms" around the problem. The court identified O'Malley's past probation violations, noting that he was "a difficult person to bring around on some of these

issues" but that he had "a lot of life left," being only 31 years old, and that "there [was] no reason to give up on turning it around."

{¶ 15} So, in addition to the vehicle forfeiture, the trial court imposed the maximum 365-day jail term, suspending 335 days so that O'Malley would serve only the mandatory 30-day jail term. *See* R.C. 4511.19(G)(1)(c)(i). O'Malley was also placed on probation for one year. The court assessed six points to his license and suspended his license for four years, noting that he could have limited driving privileges after paying his fines and costs and with the use of an ignition-interlock system and restrictive license plates. The court ordered O'Malley to pay the minimum monetary fine of $850, *see* R.C. 4511.19(G)(1)(c)(iii), plus court costs.

## C. The Ninth District Court of Appeals affirms the forfeiture of O'Malley's vehicle

{¶ 16} In a split decision, the Ninth District Court of Appeals affirmed the trial court's judgment. The lead opinion rejected O'Malley's Eighth Amendment challenge, finding that the trial court considered the relevant legal authority in its decision and that O'Malley had failed to develop his argument that the trial court neglected to adequately consider his financial position. 2020-Ohio-3141, 155 N.E.3d 156, ¶ 17-18. The lead opinion also rejected O'Malley's equal-protection challenge, finding that R.C. 4511.19(G)(1)(c)(v) survived rational-basis review. *Id*. at ¶ 32.

{¶ 17} A separate opinion, concurring in judgment only, disagreed with the lead opinion's determination that O'Malley had failed to develop his Excessive Fines Clause argument but agreed that the forfeiture did not violate the Excessive Fines Clause and that R.C. 4511.19(G)(1)(c)(v) did not violate the Equal Protection Clause of either the federal or Ohio Constitution. *Id*. at ¶ 37-38 (Hensal, J., concurring in judgment only).

{¶ 18} The dissenting opinion disagreed with the majority's determination that the forfeiture did not violate the Excessive Fines Clause, because the trial court

had not considered "the drastic impact that [the] forfeiture of O'Malley's truck would have on his personal financial condition." *Id*. at ¶ 45 (Carr, J., dissenting).

### D. We accept jurisdiction over O'Malley's appeal

{¶ 19} We accepted O'Malley's appeal and agreed to consider two propositions of law that address (1) whether R.C. 4511.19(G)(1)(c)(v) is facially unconstitutional under the Equal Protection Clauses of the United States and Ohio Constitutions and (2) whether the vehicle-forfeiture statute as applied to O'Malley was unconstitutional under the Eighth Amendment to the United States Constitution. *See* 160 Ohio St.3d 1415, 2020-Ohio-4612, 154 N.E.3d 91.

### II. ANALYSIS

### A. Facial challenge based on equal protection

{¶ 20} O'Malley asserts that R.C. 4511.19(G)(1)(c)(v) facially violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution. We conclude that the statute does not violate the Equal Protection Clause of either the United States or the Ohio Constitutions.

{¶ 21} The Fourteenth Amendment's Equal Protection Clause states that the state may not "deny to any person within its jurisdiction the equal protection of the laws." The Ohio Constitution contains a similar guarantee: "All political power is inherent in the people. Government is instituted for their equal protection and benefit." Article I, Section 2, Ohio Constitution; *see Burnett v. Motorists Mut. Ins. Co.*, 118 Ohio St.3d 493, 2008-Ohio-2751, 890 N.E.2d 307, ¶ 29; *see also Stolz v. J & B Steel Erectors, Inc.*, 155 Ohio St.3d 567, 2018-Ohio-5088, 122 N.E.3d 1228, ¶ 32, 37 (Fischer, J., concurring). The Equal Protection Clauses "prohibit[] treating similar groups differently based on criteria that are unrelated to the purpose of the law." *State v. Noling*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, ¶ 13.

{¶ 22} In evaluating an equal-protection claim, we first determine the proper standard of review. "When legislation infringes upon a fundamental

constitutional right or the rights of a suspect class, strict scrutiny applies." *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 64. But when neither a fundamental right nor a suspect class is implicated, we apply a rational-basis test. *Id.*

{¶ 23} There is no doubt that the rational-basis test applies in this case. *See State v. Tanner*, 15 Ohio St.3d 1, 5, 472 N.E.2d 689 (1984). In this case, the statutory classification O'Malley identifies in R.C. 4511.19(G)(1)(c)(v)—i.e., a vehicle involved in the offense that "is registered in the offender's name," as contrasted from an involved vehicle that is not registered in the offender's name— does not concern either a suspect class or a fundamental right. We accordingly apply the rational-basis test to the classification.

{¶ 24} In conducting a rational-basis analysis, we will uphold the statute "if it is rationally related to a legitimate governmental purpose." *Arbino* at ¶ 66. Under this review, "a statute will not be invalidated if it is grounded on a reasonable justification, even if its classifications are not precise." *Id.* "Under the rational basis standard, we are to grant substantial deference to the predictive judgment of the General Assembly." *State v. Williams*, 88 Ohio St.3d 513, 531, 728 N.E.2d 342 (2000).

{¶ 25} The government has a legitimate interest in deterring drunk driving. *See Akron v. Kirby*, 113 Ohio App.3d 452, 460, 681 N.E.2d 444 (9th Dist.1996). In response to society's recognition that drunk driving often creates unsafe road conditions, the General Assembly enacted R.C. 4511.19(G), a graduated sentencing scheme that escalates the punishment for repeat OVI offenders. *See* R.C. 4511.19(G)(1)(a) through (e); *Tanner* at 5; John F. Bender, *Ohio's New Alcohol Impaired Driving Law—A Judicial Perspective*, 15 U.Tol.L.Rev. 117, 120-125 (1983). Current statistics demonstrate that drunk driving is still the cause of many fatalities on the road, with recent data from the National Highway Traffic Safety Administration ("NHTSA") indicating that alcohol-impaired drivers were

8

responsible for roughly 30 percent of Ohio's 1,153 traffic-related fatalities in 2019. National Highway Traffic Safety Administration, *Overview of Motor Vehicle Crashes in 2019* (Dec. 2020), https://crashstats.nhtsa.dot.gov/Api/Public /ViewPublication/813060 (accessed June 22, 2022) [https://perma.cc/5Q4L-UPVP]. Therefore, it is readily apparent that the government has a legitimate interest in deterring drunk driving.

{¶ 26} Whether a law is rationally related to a legitimate government interest depends on whether there is " 'a plausible policy reason for the classification.' " *Noling*, 149 Ohio St.3d 327, 2016-Ohio-8252, 75 N.E.3d 141, at ¶ 20, quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). A statutory classification will not be found invalid just because it is underinclusive and could have been drafted more expansively to cover additional evils. *See New Orleans v. Dukes*, 427 U.S. 297, 305, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

{¶ 27} Targeting a vehicle involved in an OVI offense that is registered in the repeat offender's name is rationally related to the government's interest in deterring drunk driving. The General Assembly enacted R.C. 4511.19(G) to deter people from driving drunk and to punish those who continue to do so to better protect Ohioans and their property from the damage that may follow. *See* Katz & Sweeney, *Ohio's New Drunk Driving Law: A Halfhearted Experiment in Deterrence*, 34 Case W.Res.L.Rev. 239, 241-242 (1984); *Tanner*, 15 Ohio St.3d at 5, 472 N.E.2d 689. While R.C. 4511.19(G)(1)(c)(v) applies only to repeat offenders who are the owners of the vehicle used in the offense, R.C. 4511.203(C)(3)(c) permits vehicle forfeiture for owners who on more than two occasions lent their vehicles to individuals who they knew or had reasonable cause to believe would engage in impaired driving, *see* R.C. 4511.203(A)(4). The General Assembly targeted vehicles that could be accessed by drunk drivers.

{¶ 28} There are many plausible reasons for this type of distinction. These statutes demonstrate that the legislature does not want vehicles in the hands of drunk drivers. It appears that the General Assembly meant to deter vehicle owners from engaging in drunk driving or furnishing their vehicles to those who would engage in drunk driving—the thought being that the loss of a vehicle would be a significant deterrent that would keep more drunk drivers off the road. It was also reasonable for the General Assembly to think that taking away a repeat offender's vehicle would make it harder for those inclined to drink and drive on a regular basis to commit those offenses in the future. The fact that the General Assembly does not require the forfeiture of a vehicle for repeat OVI offenders who are nonowners is of no consequence, since a clear goal of the legislature was to protect Ohioans and their property from an out-of-control vehicle driven by an impaired driver, and the best way to do that is to prevent a drunk person from accessing a vehicle in the first place. Accordingly, there are many sound policy reasons for the classification, and the statute thus survives a rational-basis analysis.

{¶ 29} Consequently, we hold that the statutory classification contained in R.C. 4511.19(G)(1)(c)(v) does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution or Article I, Section 2 of the Ohio Constitution.

### B. As-applied challenge based on the Excessive Fines Clause
### of the Eighth Amendment

{¶ 30} O'Malley argues that the forfeiture of his truck under R.C. 4511.19(G)(1)(c)(v) is an unconstitutionally excessive fine under the Eighth Amendment to the United States Constitution because the vehicle forfeiture is grossly disproportionate to his OVI offense. Because O'Malley has relied exclusively on the Eighth Amendment and has not invoked Article I, Section 9 of the Ohio Constitution, which also prohibits "excessive fines," we do not consider the Ohio constitutional provision in this case.

{¶ 31} O'Malley challenges the statute as applied to the circumstances of his case. The trial court, citing *State v. Ziepfel*, 107 Ohio App.3d 646, 653, 669 N.E.2d 299 (1st Dist.1995), found that O'Malley had to prove by a preponderance of the evidence that the forfeiture was excessive. But this is not the correct burden of proof for an as-applied constitutional challenge.

{¶ 32} For O'Malley to succeed on his as-applied constitutional challenge, he must prove by clear and convincing evidence that the statute's application to his particular set of facts is unconstitutional. *Belden v. Union Cent. Life Ins. Co.*, 143 Ohio St. 329, 55 N.E.2d 629 (1944), paragraph six of the syllabus; *see also Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 38; *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 21; *State v. Warren*, 118 Ohio St.3d 200, 2008-Ohio-2011, 887 N.E.2d 1145, ¶ 22. This means that O'Malley must produce evidence that creates a "firm belief" that R.C. 4511.19(G)(1)(c)(v) is unconstitutional as applied to him. *See Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 33} Acknowledging O'Malley's burden of proof, we accept the trial court's factual findings if they are supported by some competent and credible evidence. *See State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). However, in determining whether a fine is constitutionally excessive—applying the constitutional standard to supported facts—we conduct a de novo review. *See United States v. Bajakajian*, 524 U.S. 321, 336, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), fn. 10.

{¶ 34} We find that O'Malley does not meet his burden.

### 1. The Eighth Amendment applies to vehicle forfeitures ordered under R.C. 4511.19(G)(1)(c)(v)

{¶ 35} When this court interprets and applies the Eighth Amendment, we focus on the text, history, and tradition of that amendment in our analysis. *See*

*Hockett v. State Liquor Licensing Bd.*, 91 Ohio St. 176, 179-180, 110 N.E. 485 (1915); *Harmelin v. Michigan*, 501 U.S. 957, 994, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265-273, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (relying on the plain language of the Eighth Amendment and reviewing its history and development from the Magna Carta and the English Bill of Rights to evaluate whether punitive-damage award made by civil jury was unconstitutionally excessive).

**{¶ 36}** The Eighth Amendment prohibits the imposition of excessive fines as punishment. *Austin v. United States*, 509 U.S. 602, 609-610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *see also Browning-Ferris* at 265. That prohibition against excessive fines is fully applicable in this state, *Timbs v. Indiana*, __ U.S. __, __, 139 S.Ct. 682, 687, 203 L.Ed.2d 11 (2019), and covers two types of forfeitures, in rem forfeitures and in personam forfeitures. *Bajakajian* at 333.

**{¶ 37}** An in rem forfeiture is a civil forfeiture that is applied to "lawful property [that] has committed an offense." *Austin* at 624 (Scalia, J., concurring in part and concurring in judgment). An in personam forfeiture, however, is a forfeiture that is used to punish an individual for committing a criminal offense and is thus considered a fine. *Bajakajian*, 524 U.S. at 328, 332, 118 S.Ct. 2028, 141 L.Ed.2d 314.

**{¶ 38}** Here, R.C. 4511.19(G)(1)(c)(v) requires forfeiture of an offender's vehicle if the vehicle involved in the OVI offense was owned by the offender and the offender had previously been convicted of OVI violations twice within ten years of the offense. Therefore, the forfeiture of O'Malley's truck is an in personam forfeiture that is subject to the Excessive Fines Clause. *See State v. Hill*, 70 Ohio St.3d 25, 635 N.E.2d 1248 (1994), syllabus.

*2. We apply a gross-disproportionality standard when evaluating whether an in personam fine is unconstitutionally excessive*

{¶ 39} The type of forfeiture at issue dictates the analysis used to evaluate whether a forfeiture is unconstitutionally excessive under the Eighth Amendment. For in rem forfeitures, courts must first determine whether the forfeited property was an instrumentality—i.e., whether the forfeited item has a close enough relationship to the offense—and second whether the forfeiture is grossly disproportional to the gravity of the defendant's offense. *Bajakajian* at 333-334; *Austin*, 509 U.S. at 628, 113 S.Ct. 2801, 125 L.Ed.2d 488 (Scalia, J., concurring in part and concurring in judgment). But courts evaluating in personam forfeitures need only determine whether the forfeiture is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian* at 334.

{¶ 40} The instrumentality element necessary for an in rem forfeiture is not necessary for an in personam forfeiture, *see id.* at 333, because the instrumentality element is generally already established by nature of the defendant's conviction. *See State v. Timbs*, 134 N.E.3d 12, 28-29 (Ind.2019). So, to determine whether an in personam criminal forfeiture is constitutionally permissible, courts must conduct a gross-disproportionality analysis to evaluate the fine as compared to the gravity of the offense. But how a court conducts a gross-disproportionality analysis is not well settled.

{¶ 41} In *Hill*, we held that trial courts must make an independent determination whether the forfeiture of property is an excessive fine prohibited by the Excessive Fines Clause. 70 Ohio St.3d at 34, 635 N.E.2d 1248. We declined to set forth a bright-line test and instead, we encouraged trial courts to analyze forfeitures "in light of the principles" outlined in our opinion. *Id.* at 35, fn. 4.

{¶ 42} Relying on two federal circuit court decisions, *United States v. Sarbello*, 985 F.2d 716, 724, (3d Cir.1993), and *United States v. Busher*, 817 F.2d 1409, 1415 (9th Cir.1987), fn. 10, we identified various factors that could be

considered in an excessive fines analysis: (1) "the moral gravity of the crime" and "nature of its harmful reach"; (2) "personal benefit reaped by the defendant"; (3) "the defendant's motive and culpability"; (4) "the extent that the defendant's interest * * * [is] tainted by [the] criminal conduct"; (5) "the dollar volume of the loss caused"; (6) whether the defendant caused, threatened, or risked physical harm; (7) the severity of the collateral consequences of the crime; and (8) any other punishment imposed for the offense. *Hill* at 33-34. We recognized that disproportionality reaches a level of excessiveness when " 'the punishment is more criminal than the crime.' " *Hill* at 34, quoting *Sarbello* at 724. And we noted that a " 'forfeiture is not rendered unconstitutional because it exceeds the harm to the victims or the benefit to the defendant.' " *Id*., quoting *Busher* at 1415. The Excessive Fines Clause " 'prohibits only those forfeitures that * * * are *grossly disproportionate* to the offense committed.' " (Emphasis added in *Busher*.) *Id*., quoting *Busher* at 1415.

**{¶ 43}** Four years after our decision in *Hill*, the United States Supreme Court addressed another excessive-forfeiture case in *Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314. The Supreme Court also found it difficult to articulate a standard. *Id*. at 335. The court noted that there was no historical guidance on how disproportional a forfeiture must be to the gravity of an offense to be constitutionally excessive. *Id*. Though the court determined that a gross-disproportionality standard was appropriate, it did not set forth a bright-line test for courts to utilize in their analyses. Instead, the Supreme Court weighed several factors it found relevant based on the facts of that case.

**{¶ 44}** The first factor was the type of crime committed. *Id.* at 337. The second factor was whether the crime was related to other criminal activity. *Id.* at 337-338. The third factor was whether the defendant fit into the class of persons against whom the statute was designed to target. *Id.* at 338. The fourth factor was consideration of the sentence that could be imposed and whether it indicated a

"minimum level of culpability." *Id.* at 338-339. The fifth factor was the degree of harm caused by the defendant. *Id.* at 339. And the sixth factor was a comparison between the fine imposed for the crime and the amount of the forfeiture. *Id.* at 340. Another important factor noted was that the reviewing court " 'should grant substantial deference' " to the legislature's choice of penalty for the crime. *Id.* at 336, quoting *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

{¶ 45} Since *Bajakajian*, other state courts and federal courts have grappled with the question of what factors should be included in a gross-disproportionality analysis. Many courts have tried to develop suitable multifactor proportionality tests, confronting forfeitures of real property, personal property (including motor vehicles), money, and other assorted criminal proceeds, but they have not achieved uniformity.

{¶ 46} In that regard and in widely varying formulations, many courts consider (1) the nature and extent of the criminal activity and its relation to other criminal activity, (2) whether the defendant fit into the class of persons at whom the statutory offense was directed, (3) the amount of the forfeiture and its relationship to the maximum authorized sentence or fine that could have been imposed, and (4) the harm caused by the offense. *See*, *e.g.*, *United States v. Abair*, 746 F.3d 260, 267 (7th Cir.2014); *Dean v. State*, 230 W.Va. 40, 50, 736 S.E.2d 40 (2012). Some courts consider "1) the gravity of the offense and the harshness of the penalty; 2) a comparison of the contested fine with fines imposed for the commission of the other crimes in the same jurisdiction; and 3) comparison of the contested fine with fines imposed for the commission of the same crime in other jurisdictions." *Miller v. One 2001 Pontiac Aztek*, 669 N.W.2d 893, 895 (Minn.2003), citing *Solem* at 290-291.

{¶ 47} Some courts consider the forfeiture's economic impact on the defendant. *See*, *e.g.*, *Timbs*, 134 N.E.3d at 36 (vehicle owner's economic means

relative to property's value is appropriate consideration for determining magnitude of punishment); *see also Nassau Cty. v. Canavan*, 1 N.Y.3d 134, 140, 770 N.Y.S.2d 277, 802 N.E.2d 616 (2003). But at least one federal court of appeals has flatly refused to do so. *See United States v. Dicter*, 198 F.3d 1284, 1292 (11th Cir.1999), fn. 11 ("we do not take into account the personal impact of a forfeiture on the specific defendant in determining whether the forfeiture violates the Eighth Amendment"). *But see United States v. Levesque,* 546 F.3d 78 (1st Cir.2008) (a court should "consider whether [the] forfeiture would deprive the defendant of his or her livelihood" in an Eighth Amendment excessive-fines analysis); *United States v. Tosca*, 18 F.3d 1352, 1354 (6th Cir.1994) (federal courts must consider fine-specific factors found in 18 U.S.C. 3572 and section 5E1.2(d) of the Federal Sentencing Guidelines, including the "defendant's income; earning capacity; financial resources; the burden on the defendant and his dependents; pecuniary loss inflicted on others as a result of the offense; whether restitution is ordered; the need to deprive the defendant of illegal gains; and the need to promote respect for the law, provide just punishment, and adequate deterrence").

{¶ 48} The Indiana Supreme Court's decision in *Timbs*, 134 N.E.3d 12—on remand from the United States Supreme Court—which sought to determine whether a civil forfeiture resulting from a criminal conviction was unconstitutionally excessive, is a recent but representative example of courts' laudable attempts to formulate multifactor analyses to expound comprehensively on what exactly the Eighth Amendment means by its succinct prohibition of "excessive fines." The Indiana Supreme Court found that three considerations—the harshness of the punishment, the severity of the offenses, and the defendant's culpability—were necessary to its excessiveness analysis. *Id.* at 36-38. However, the court did not commit to any exclusive list of factors that should be evaluated in each of these considerations. *Id.* at 36. Rather, the court included lists of factors that may be relevant in the analysis of each consideration. *Id*. at 36-38. The Indiana

16

Supreme Court recently affirmed its own take on that proportionality test for in rem forfeitures in *State v. Timbs*, 169 N.E.3d 361 (Ind.2021).

{¶ 49} The application of these multifactor proportionality tests generally varies depending on whether the forfeiture is in personam or in rem and depending on whether the property to be forfeited is real property, personal property, or something else. The problem is that there does not appear to be any consensus. Nevertheless, O'Malley and his amicus curiae ask us to do what other federal and state courts have done: set forth a multifactor test that would include in the proportionality analysis considerations of the defendant's financial ability to pay and the extent to which the forfeiture would harm the defendant's livelihood. While we appreciate the allure of a seemingly airtight checklist that ideally would—but in practice may not—address all future contingencies, we do not believe—for both practical and principled reasons—that it is necessary or appropriate for us to establish the multifactor test sought in this case. Instead, we rely on our decision in *Hill* and the United States Supreme Court's decision in *Bajakajian* to evaluate the forfeiture imposed in this case.

{¶ 50} The dissenting opinion criticizes this approach by claiming that we provide no additional guidance and merely engage in error correction. The dissent is mistaken. Rather, in this case, we have revisited an issue that is of great public interest, reviewed how the issue has developed over the past 30 years since we decided *Hill*, and have simply come to the same conclusion that we reached in *Hill*—a bright-line test analyzing an Eighth Amendment excessiveness challenge is not appropriate. We must allow trial courts flexibility so that they may consider the situation before them and make a fully informed and reasoned decision about whether a forfeiture is unconstitutionally excessive. We need not bind trial courts' hands in these already difficult forfeiture cases.

### 3. Analysis of R.C. 4511.19(G)(1)(c)(v) under the Excessive Fines Clause

{¶ 51} To determine whether a criminal forfeiture is constitutionally permissible, courts must ask whether the forfeiture is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334, 118 S.Ct. 2028, 141 L.Ed.2d 314. In other words, courts must do some balancing: weighing the value of the thing seized on the one hand against the gravity of the offense on the other hand.

a. The value of the vehicle subject to forfeiture

{¶ 52} On the value side of the equation, there is no doubt that O'Malley's 2014 Chevrolet Silverado was valuable, in both a real and an intangible sense. The vehicle was apparently O'Malley's only significant asset and was worth approximately $31,000. It was also his primary means of transportation, including to and from any job he might hold. The loss of his truck thus has an obvious impact on O'Malley's wealth in the near and long term. Under the Eighth Amendment, that is not nothing. *See Timbs*, __ U.S. at ___, 139 S.Ct. at 687-688, 203 L.Ed.2d 11 (explaining that the Excessive Fines Clause follows the English tradition of prohibiting financially ruinous fines for relatively minor crimes). But it is not everything either. *See Bajakajian* at 336 (explaining that "strict proportionality" is not required).

b. Gravity of the offense

{¶ 53} In addition to considering the value of the forfeiture and the hardship this forfeiture would work on O'Malley, we must also consider the gravity of his offense. The gravity of the offense necessarily means the seriousness and severity of the crime. *See Bajakajian* at 339-340; *Timbs*, 134 N.E.3d at 37. This consideration requires that we determine the seriousness of the offense as dictated by the General Assembly, paying close attention to the purpose of the statute and the statutory penalties the legislature selected for the offense. *See Timbs*, 134 N.E.3d at 37. We must also consider O'Malley's culpability, *Bajakajian* at 339,

18

and the harm caused by his commission of the crime, *id*. at 339-340; *Timbs* at 37-38. In this case, the severity of O'Malley's offense, driving drunk on a holiday after already having two convictions for the same conduct, cannot be minimized.

*i. The legislature chose to criminalize drunk driving and require offenders who commit three or more OVI violations within a specific period of time to forfeit the vehicle used to commit the offense*

{¶ 54} While forfeitures are generally not favored in law or in equity, *State v. Baumholtz*, 50 Ohio St.3d 198, 202, 553 N.E.2d 635 (1990), they are not prohibited. Given the legislature's broad authority to define crimes and establish the appropriate punishment for an offense, we must give substantial deference to the legislature's choice of punishment. *See Solem*, 463 U.S. at 290, 103 S.Ct. 3001, 77 L.Ed.2d 637; *see also Baumholtz* at 202 (this court "must keep [the] legislative purpose in mind when assessing the application of [a] forfeiture statute").

(A) Graduated sentencing scheme

{¶ 55} The General Assembly enacted R.C. 4511.19 to criminalize intoxicated driving. It also established penalties designed to deter people from driving while intoxicated in order to protect Ohioans and their property from the damage that may follow. *See* Katz & Sweeney, 34 Case W.Res.L.Rev. at 241-242; *Tanner*, 15 Ohio St.3d at 5, 472 N.E.2d 689. But the General Assembly did not treat all impaired drivers equally in R.C. 4511.19. *See* Katz & Sweeney at 246. Rather, the legislature enacted a graduated sentencing scheme that escalates an offender's punishment based on how many times the offender has been previously convicted of an OVI offense. *See* R.C. 4511.19(G)(1)(a) through (e). Reviewing the entire sentencing scheme places the forfeiture penalty for a third-time repeat offender into perspective.

{¶ 56} Under R.C. 4511.19(G)(1), whoever violates R.C. 4511.19(A)(1)(a) through (i) or (A)(2) "is guilty of operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them." For a first-time OVI offender, the

General Assembly chose to impose the smallest fine in the scheme: between $375 and $1,075, R.C. 4511.19(G)(1)(a)(iii). The General Assembly did not place additional restrictions or limitations on the offender's use of the vehicle used to commit the crime. However, for offenders with one or more OVI convictions within ten years of the offense, the penalties steadily become more severe.

{¶ 57} For a second-time OVI offender, the General Assembly increased the fine range to between $525 and $1,625. R.C. 4511.19(G)(1)(b)(iii). In addition to the fine, the General Assembly prescribed that the vehicle involved in the offense be immobilized and the license plates impounded for 90 days if the vehicle was registered in the offender's name. R.C. 4511.19(G)(1)(b)(v).

{¶ 58} For a third-time OVI offender like O'Malley, the General Assembly further increased the fine range, this time between $850 and $2,750, R.C. 4511.19(G)(1)(c)(iii). Additionally, for the third-time offender, the legislature declined to utilize the immobilization penalty and instead chose to require criminal forfeiture of the vehicle involved in the offense if the vehicle was registered in the offender's name, R.C. 4511.19(G)(1)(c)(v).

{¶ 59} The General Assembly continued the pattern of increasing fines for additional OVI offenses. R.C. 4511.19(G)(1)(d)(iii). And it continued to attach the mandatory forfeiture of the vehicle involved to those subsequent offenses. R.C. 4511.19(G)(1)(d)(v).

{¶ 60} When we look at this statutory scheme, we see that the General Assembly gave offenders like O'Malley two strikes before imposing the penalty of forfeiture. The legislature chose to gradually increase the punishment for each OVI offense and save the harshest penalty, the forfeiture of the vehicle involved, for individuals who chose to disobey the law and place their communities at risk by driving while impaired at least three times within the past ten years.

### (B) R.C. 4511.19 punishes driving drunk

**{¶ 61}** In addition to this graduated sentencing scheme, the legislature wrote R.C. 4511.19 to punish those who drive drunk regardless of the consequences of their actions. *See State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 15. This court said as much when determining whether R.C. 4511.19(A)(1)(a) and R.C. 2903.08(A)(1)(a), a statute that criminalizes severely injuring someone while driving drunk, were allied offenses for purposes of sentencing. *Earley* at ¶ 15.

**{¶ 62}** In *Earley*, we explicitly held that the two offenses, though similar, accomplished different goals and had different purposes. *Id.* R.C. 2903.08(A)(1)(a) "has a different import and significance than merely driving under the influence, for aggravated vehicular assault necessarily involves causing serious physical harm to another person." *Earley* at ¶ 15. On the other hand, a violation of R.C. 4511.19(A)(1)(a) "occurs any time an individual drives under the influence of alcohol or drugs, and one who does so commits this offense regardless of any subsequent consequences that occur due to the impaired driver's actions." *Id.*

**{¶ 63}** Reading the plain language of R.C. 4511.19 and following this court's prior interpretations of the purpose of that statute, we must conclude that the General Assembly sought to punish repeat drunk drivers regardless of the consequences of those actions. And it is apparent that O'Malley falls squarely within the class of persons addressed by R.C. 4511.19(G)(1)(c)(v)—he is a repeat drunk driver.

### (C) Mandatory forfeiture of the vehicle involved

**{¶ 64}** We also recognize that the General Assembly chose to make vehicle forfeiture for a repeat OVI offender mandatory and without a statutory exception. The legislative scheme provides no deference to the trial court—simply put, once an owner is found guilty of a qualifying third OVI offense, the forfeiture of the

offender's vehicle is mandatory under R.C. 4511.19(G)(1)(c)(v) so long as that forfeiture is not unconstitutionally excessive.

{¶ 65} This is in stark comparison to R.C. 2981.09, another forfeiture statute that does not apply here, in which the General Assembly prohibited the forfeiture of property in certain criminal cases "to the extent that the amount or value of the property is disproportionate to the severity of the offense," R.C. 2981.09(A). In R.C. 2981.09, the legislature set out factors that a court must consider when determining whether a forfeiture is appropriate, R.C. 2981.09(C) and (D). The General Assembly did not, however, provide this type of exception or any explanation in R.C. 4511.19(G)(1)(c)(v).

{¶ 66} Furthermore, the legislature did not simply choose to require the repeat offender to forfeit any vehicle that the individual owns—the repeat offender is required to forfeit the vehicle that was involved in the crime. R.C. 4511.19(G)(1)(c)(v). Here, the trial court noted that O'Malley's truck bore a "close relation to the crime" because it was "the very medium for committing the offense." And the Ninth District's lead opinion reemphasized this point in its analysis. 2020-Ohio-3141, 155 N.E.3d 156, at ¶ 11. We also find this point relevant, recognizing that this was the legislature's justification for the type of forfeiture required in this case.

{¶ 67} Though any instrumentality requirement is necessarily satisfied by O'Malley's conviction, it would defy common sense for us to ignore the fact that the General Assembly's directive is aimed at the vehicle used to commit the offense. *See* R.C. 4511.19(A)(1) (forbidding a person from operating "any vehicle, streetcar, or trackless trolley" if the person is under the influence of alcohol or drugs); R.C. 4511.19(G)(1)(c)(v) (requiring the offender to forfeit "the vehicle involved in the offense"). Thus, the legislature's emphasis on the relationship between the vehicle and the crime is relevant to our analysis of the punishment it required for repeat OVI offenders.

**{¶ 68}** We note that the forfeitures required by the General Assembly relate to the problem of recidivism among drunk drivers. *See* Katz & Sweeney, 34 Case W.Res.L.Rev. at 246-247. Indeed, research by NHTSA indicates that repeat offenders, like O'Malley, are a significant reason for drunk-driving fatalities. *See* National Highway Traffic Safety Administration, *Drunk Driving*, https://www.nhtsa.gov/risky-driving/drunk-driving#alcohol-abuse-and-cost-5091 (accessed June 30, 2022) [https://perma.cc/H5VR-M4RB]. Given these realities, it is no surprise that the General Assembly chose to require the forfeiture of vehicles owned and used by repeat drunk drivers. Simply put, drunk driving does not happen (again and again) without a vehicle.

**{¶ 69}** Reviewing the plain language of R.C. 4511.19(G)(1)(c)(v), we conclude that the General Assembly intended to mandate forfeiture of the vehicle involved in the OVI offense with no exceptions. Because O'Malley had two prior OVI convictions within ten years of his July 2018 OVI offense and the vehicle involved in that offense was registered in his name, the statute required criminal forfeiture of O'Malley's truck upon his conviction. The General Assembly's decision to punish repeat drunk-driving offenders more harshly than other criminal offenders speaks volumes about the purpose of the punishment—to deter people from driving drunk and unnecessarily placing Ohioans at risk and to punish those who choose to do so more than twice in a ten-year period.

### (D) Deference to the legislature

**{¶ 70}** Because judgments about the appropriate punishment for the harm or risk of harm created by criminal misconduct belong in the first instance to the legislature, the General Assembly's determination is entitled to substantial deference when we consider the fit between the crime and the penalty. *See* *Bajakajian*, 524 U.S. at 336, 118 S.Ct. 2028, 141 L.Ed.2d 314; *Solem*, 463 U.S. at 290, 103 S.Ct. 3001, 77 L.Ed.2d 637. We recognize that the General Assembly purposefully constructed a graduated sentencing scheme to punish and deter

offenders, in accord with the regularity of their misconduct, from driving while impaired. We further recognize that the General Assembly specifically chose to punish offenders for simply driving while intoxicated and that O'Malley is therefore the type of offender subject to this punishment. We also acknowledge the General Assembly's emphasis on the close relationship between the vehicle subject to forfeiture and the crime, and we note its decision to not provide any exceptions to the forfeiture requirement for an offender who has sole ownership of the vehicle. It follows, then, that we must give significant weight to the legislature's choice of penalty for a third-time drunk-driving offender like O'Malley—the forfeiture of the vehicle involved in the offense. Therefore, this factor weighs heavily against O'Malley in the gross-disproportionality analysis.

### ii. O'Malley chose to drive drunk and is culpable

{¶ 71} In evaluating the gravity of the offense, we also consider O'Malley's culpability in his commission of the crime. *Bajakajian* at 338-339.

{¶ 72} In *Bajakajian*, the United States Supreme Court identified the maximum penalties that could be imposed for the offense, a six-month jail term and a $5,000 fine, and found that they demonstrated a "minimal level of culpability." *Id*. The Supreme Court, however, did not explain why those numbers showed a minimum level of culpability.

{¶ 73} Certainly, the legislature's choice of punishment shows the level of culpability, but focusing solely on the jail term and the fine imposed does not accurately quantify the magnitude of the offense because it ignores the General Assembly's imposition of a forfeiture. O'Malley's offense falls within the third tier of escalating drunk-driving penalties; it contains a mandatory jail term, a mandatory fine, and a mandatory forfeiture. *See* R.C. 4511.19(G)(1)(c). This penalty is harsher than the penalties imposed for at least two categories of drunk-driving offenses, *see* R.C. 4511.19(G)(1)(a) and (b), and it is harsher than what many first-time lower-level felony offenders receive at sentencing, *see, e.g.*, R.C.

2929.13(B)(1)(a) (a court shall sentence an offender to community control if the offender pleads guilty to a fourth- or fifth-degree felony offense that is not an offense of violence). The legislature indicated that drivers like O'Malley are more culpable, since they fall within the third tier of drunk-driving offenses, *see* R.C. 4511.19(G)(1)(c), and are required to serve jail time, pay a fine, and forfeit his vehicle.

{¶ 74} The dissenting opinion points out that the General Assembly made a violation of R.C. 4511.19(A)(1) a misdemeanor offense, not a felony offense, and argues that this factor deserves great weight, especially when considering that O'Malley's vehicle was his only significant asset. The General Assembly's decision to classify a violation of R.C. 4511.19(A)(1) as a misdemeanor offense indeed demonstrates a lower level of culpability. However, the classification must be taken into consideration along with the punishment chosen by the General Assembly for the offense, which was jail time, a fine, and forfeiture of the vehicle.

{¶ 75} Additionally, the trial court's sentencing order is not determinative of the offender's level of culpability, because the General Assembly has required that a trial court consider far more than the offender's culpability when crafting an appropriate sentence. *See* R.C. 2929.11, 2929.12, 2929.21, and 2929.22. There are multiple aggravating and mitigating factors that must be considered by trial courts at sentencing, *see* R.C. 2929.11 and 2929.12 (felony sentencing); R.C. 2929.21 and 2929.22 (misdemeanor sentencing), and the consideration and weight of any factor is not required to be placed on the record, *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649, ¶ 20. Thus, we must recognize that there are multiple variables in a court's sentencing determination that may not relate to culpability.

{¶ 76} In situations like O'Malley's, the trial court knows that the forfeiture of the vehicle, no matter its value, is mandatory and that the court has more discretion to tailor the amount of any monetary fine and the jail term to punish the offender. Thus, it is unclear whether a trial court's imposition of a lesser fine or

shorter jail term necessarily informs this court about the offender's culpability. Rather, the mandatory vehicle forfeiture may impact the fine amount or even the jail term as much as the severity of the crime. *See, e.g.*, *United States v. Porcelli*, 440 Fed.Appx. 870, 879 (11th Cir.2011) (recognizing the district court's waiver of a fine and downward sentencing departure in concluding that the forfeiture was *not* grossly disproportional to the gravity of the offense). And here, the trial court ordered the forfeiture of O'Malley's truck prior to imposing the sentence, thus supporting the idea that the forfeiture was a consideration in the trial court's sentencing determination.

{¶ 77} It is true that O'Malley received probation and was ordered to serve only 30 days in jail. But there may have been any number of reasons why the trial court imposed that sentence. Here, O'Malley pleaded no contest and was found guilty. His defense counsel expressed at sentencing that counsel was aware that the trial court intended to place O'Malley on probation, which the court ultimately did. We cannot glean whether this imposition of the minimum mandatory jail term and probation was due to O'Malley's culpability, plea negotiations, or his decision to take responsibility for his actions.

{¶ 78} These variables in sentencing make it difficult to conclude that a trial court's sentencing decision, especially when a plea is involved, necessarily reflects the offender's culpability. The fact of the matter is that a trial court considers many factors, including the offender's culpability, when crafting the appropriate sentence. Therefore, in this case, we do not blindly place significant weight on the trial court's sentencing decision in determining O'Malley's level of culpability when evaluating the gravity of his offense.

{¶ 79} In addition to the legislature's sentencing scheme, we review the facts as found by the trial court and the sentence in total to determine culpability. Here, the trial court recognized that this was O'Malley's third drunk-driving offense in ten years. O'Malley was pulled over in the early morning hours of

Independence Day, July 4, 2018. The court believed O'Malley to have been "very intoxicated." As noted above, when police asked for his license, O'Malley gave his credit card. And when police asked for his address, O'Malley was unable to provide it. The court believed that O'Malley had "placed the driving public at grave risk" and that under the circumstances, it was fortunate he had been pulled over. The court ordered the forfeiture of O'Malley's vehicle first and then proceeded to sentencing.

{¶ 80} O'Malley's counsel explained that counsel was aware that the court intended to place O'Malley on probation, and he emphasized that O'Malley had worked to address his problems with alcohol by participating in Alcoholics Anonymous and completing an outpatient treatment program. O'Malley also expressed remorse for his actions.

{¶ 81} The trial court then recognized that the purpose of sentencing for a misdemeanor offense is to "[p]unish the offender and protect the public." The court acknowledged that it had taken both of those factors into consideration in its sentencing decision. The court also acknowledged that it believed O'Malley had a problem with alcohol and that it was good that he was taking affirmative steps to address the issue. Additionally, while the court noted O'Malley's past probation violations, it also emphasized that he was still a young man with plenty of time to turn things around.

{¶ 82} Ultimately, the court placed O'Malley on probation for one year and fined him $850. The court suspended his license for four years, noting that he could have limited driving privileges—with the use of an ignition-interlock system and restrictive license plates—after paying his fines and fees. The court imposed a 365-day jail term but suspended 335 days, providing for the mandatory 30 days in jail.

{¶ 83} These facts demonstrate a higher level of culpability—O'Malley knew full well that driving drunk is illegal and that he could lose his vehicle if he was caught, yet he chose to get behind the wheel while impaired on one of the

busiest travel days of the summer. *See* Ellen Edmonds, *AAA: Nearly 47 Million Americans Will Set New Independence Day Holiday Travel Record* (June 21, 2018), https://newsroom.aaa.com/2018/06/47-million-americans-new-independence-day-travel-record/ (accessed July 1, 2022) [https://perma.cc/KT28-G8G7]. This record shows that the trial court considered multiple factors in crafting O'Malley's sentence, including its acknowledgment of O'Malley's progress in altering his relationship with alcohol. The court recognized that this was a very serious offense and that the situation could have been worse had a state trooper not pulled O'Malley over.

**{¶ 84}** Therefore, based on these considerations, O'Malley's culpability is not minimal, as opposed to what the United States Supreme Court found in *Bajakajian*. Although his offense is classified as a misdemeanor, the overall sentencing scheme indicates a higher level of culpability, and O'Malley's sentence reflects that this was a serious offense but that the forfeiture likely played a role in the trial court's sentencing decision. These factors demonstrate that O'Malley is highly culpable for the offense, which weighs against him here.

**{¶ 85}** Additionally, we acknowledge that O'Malley's only crime was driving drunk and that this offense was not related to any other illegal activities. Further, it was lawful for him to possess and use his vehicle while not impaired. The fact that he committed no other crimes during the commission of the offense weighs against forfeiture.

### iii. O'Malley harmed society when he drove drunk

**{¶ 86}** In considering the gravity of the offense in the gross-disproportionality analysis, we also consider the harm caused by the offender. *See Bajakajian*, 524 U.S. at 339, 118 S.Ct. 2028, 141 L.Ed.2d 314. The trial court emphasized that O'Malley caused no physical harm to persons or damage to any property. This is true. But our harm analysis is not limited solely to tangible forms of harm. The history of the Excessive Fines Clause of the Eighth Amendment and

the United States Supreme Court's precedents support the notion that harm to society may be considered in a proportionality analysis.

**{¶ 87}** In the many cases in which the United States Supreme Court has discussed the history of the Eighth Amendment, the court has said nothing about a tangible harm being necessary when evaluating whether a fine is excessive. *See, e.g.*, *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 681-689, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *Solem*, 463 U.S. at 284-296, 103 S.Ct. 3001, 77 L.Ed.2d 637; *Browning-Ferris*, 492 U.S. at 259-276, 282-301, 109 S.Ct. 2909, 106 L.Ed.2d 219; *Timbs*, __ U.S. at __, 139 S.Ct. at 686-698, 203 L.Ed.2d 11. Rather, the focus has always been on the requirement that the fine be related to the manner and the magnitude—the greatness—of the offense. *See Browning-Ferris* at 289 (O'Connor, J., concurring in part and dissenting in part), quoting *Le Gras v. Bailiff of Bishop of Winchester*, Y.B. Mich. 10 Edw. II, pl. 4 (1316), reprinted in 52 Selden Society 3, 5 (1934) (explaining that after Magna Carta, amercements had to be " 'proper to the magnitude and manner of that offence' "); *Bajakajian* at 335, quoting Magna Carta, 9 Henry III, Chapter 14 (1225), 1 Stat. at Large, 6-7 (1762 Ed.) (Magna Carta required that amercements be based on the " 'manner ' " and " 'greatness' " of the fault); *Timbs* at __, 139 S.Ct. at 693 (Thomas, J., concurring in judgment only), quoting *Le Gras*, reprinted in 52 Selden Society at 5 (amercements should be proportioned to the offense, considering the " 'magnitude and manner' " of the offense).

**{¶ 88}** While tangible harm is certainly relevant in evaluating the magnitude of the offense, it is not the only form of harm that may be considered. The United States Supreme Court has specifically stated that a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria and that "[c]omparisons can be made in light of the harm caused *or threatened* to the victim *or society*." (Emphasis added.) *Solem* at 292. Therefore, in accord with our decision in *Hill*, 70 Ohio St.3d at 34, 635 N.E.2d

1248, we may consider the harm caused or threatened to society in evaluating the magnitude of the offense.

{¶ 89} Eighth Amendment history also supports the assertion that an actual or threatened wrong to society could be considered harm and be penalized by a fine. Requiring payment from wrongdoers for harms to society is a centuries-old concept. "[I]n pre-Norman England, the victim of a wrong would, rather than seek vengeance through retaliation * * *, accept financial compensation for the injury from the wrongdoer." *Browning-Ferris* at 287 (O'Connor, J., concurring in part and dissenting in part). In addition to paying for the injury itself, "[t]he wrongdoer could also be made to pay an additional sum 'on the ground that *every evil deed inflicts a wrong on society* in general.' " (Emphasis added.) *Id.*, quoting McKechnie, Magna Carta at 284-285 (1958).

{¶ 90} Additionally, for those convicted of treason against the Crown, the forfeiture of their estates was "justified on the ground that property was a right derived from society which one lost by violating society's laws." *Austin*, 509 U.S. at 612, 113 S.Ct. 2801, 125 L.Ed.2d 488, citing 1 William Blackstone, *Commentaries on the Laws of England*, 299. These examples demonstrate that harm caused to society has indeed historically been considered a harm within the meaning of the Eighth Amendment. Therefore, in measuring the harm of an offense in a gross-disproportionality analysis, this court may consider the harm to society.

{¶ 91} Not only is this conclusion supported by case law, but it also makes practical sense. If harm were limited to merely tangible harm, every fine attached to a "victimless" crime, such as trespassing, illegal gambling, drug possession, and treason, would likely not include a harm—or at least no harm that is distinguishable from a harm against society. Fines would be subjected to additional and unwarranted scrutiny under the Excessive Fines Clause. This would thwart the purpose of the Excessive Fines Clause, which is to ensure that fines are not grossly disproportional and are imposed for actual offenses committed. We must consider

that drunk driving is prohibited and is criminalized under R.C. 4511.19 because the General Assembly—the voice of the people—made it so. Thus, it makes sense that societal harm may be considered harm in the gross-disproportionality analysis.

{¶ 92} We now must turn to what harm O'Malley caused in this case. We know that fortunately, he did not cause any physical damage or bodily injuries the night of his drunk-driving arrest. But we must consider whether O'Malley's decision to drive drunk that night also harmed society. We conclude that it did.

{¶ 93} Drunk driving is a societal danger. *See Missouri v. McNeely*, 569 U.S. 141, 160, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013) ("drunk driving continues to exact a terrible toll on society"). The drunk driver essentially plays Russian roulette every time he or she drives on the road while impaired. The fact that a drunk driver is removed from lanes of travel due to effective police interdiction before any physical damage can be done does not mean that the drunk driver did not cause harm to society with the turn of the ignition key.

{¶ 94} Furthermore, drunk drivers use roads paid for by taxpayers to commit this crime. Drunk drivers impede law-abiding citizens' use of those roads by making travel less safe for them. And this is no small impediment—the average American in 2018 drove over 13,000 miles per year, and that number has only increased. Federal Highway Administration, *Average Annual Miles per Driver by Age Group*, (May 31, 2022), https://www.fhwa.dot.gov/ohim/onh00/bar8.htm (accessed July 19, 2022) [https://perma.cc/Z243-66JJ]; Chris Hardesty, Kelley Blue Book, *Average Miles Driven Per Year: Why It Is Important*, (Sept. 22, 2021), https://www.kbb.com/car-advice/average-miles-driven-per-year/#:~:text=What %20Are%20Average%20Miles%20Driven,about%2039%20miles%20per%20day (accessed July 25, 2022) [https://perma.cc/7M77-E7HY] (average person drove 14,263 miles in 2019). Police presence is necessary to stop drunk drivers before they have the opportunity to injure someone. *See State v. Tidwell*, 165 Ohio St.3d 57, 2021-Ohio-2072, 175 N.E.3d 527, ¶ 3 (trooper stopped alleged drunk driver in

gas-station parking lot after a citizen yelled, "That lady is drunk"). And that is exactly what happened in this case; a state trooper stopped O'Malley for driving drunk before he had further opportunity to injure another person or himself or damage property.

{¶ 95} O'Malley chose to engage in this behavior on July 4, Independence Day, which is one of the busiest travel days of the summer. *AAA: Nearly 47 Million Americans Will Set New Independence Day Holiday Travel Record*, https://newsroom.aaa.com/2018/06/47-million-americans-new-independence-day-travel-record. The fact that O'Malley engaged in this behavior on one of America's most widely celebrated holidays, a day when many are traveling to spend time with their families, is something that must be considered when considering the harm to society.

{¶ 96} We thankfully will never know whether O'Malley's actions would have injured someone, because a state trooper intervened and pulled him over. But even so, O'Malley caused harm to society by spinning the wheel of chance and playing risky games on Ohio roads, making travel less safe for Ohioans on an important holiday. This societal harm deserves some weight in the gross-disproportionality analysis.

*iv. A fine-to-forfeiture comparison is of limited relevance in*
*a gross-disproportionality analysis*

{¶ 97} Often in these gross-disproportionality challenges, courts employ a ratio-based analysis, comparing various monetary factors to the value of the forfeited item. Specifically, the trial court determined that the $31,000 vehicle forfeiture was approximately 11 times the amount of the $2,750 maximum monetary fine under R.C. 4511.19(G)(1)(c)(iii)—a fine-to-forfeiture ratio that the trial court did not deem excessive or disproportionate when compared to forfeitures in other cases. The trial court cited *Ziepfel*, 107 Ohio App.3d at 653, 669 N.E.2d 299, in which the First District Court of Appeals upheld the forfeiture of a $23,000

motorcycle, an amount that was more than double the maximum fine for the defendant's offense. Though this was an illustrative factor used in *Bajakajian*, 524 U.S. at 339-340, 118 S.Ct. 2028, 141 L.Ed.2d 314, this type of ratio-based analysis provides little guidance in our forfeiture analysis in this context.

{¶ 98} While such fine-to-forfeiture comparisons may help illustrate the nearly limitless extremes that forfeitures may produce in some cases, we are unaware of a "magic multiplier" that would authoritatively establish under the Excessive Fines Clause a generally acceptable threshold separating that which is excessive from that which is not. Whether made consciously or subconsciously, the determination that a particular fine-to-forfeiture ratio is permissible reflects an almost inherently subjective value judgment that is fundamentally inconsistent with the objective principles that should generally govern Eighth Amendment determinations. *See Solem*, 463 U.S. at 292, 103 S.Ct. 3001, 77 L.Ed.2d 637; *Rummel v. Estelle*, 445 U.S. 263, 275-276, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

{¶ 99} This fine-to-forfeiture ratio-based analysis also ignores the statutory scheme. We must acknowledge that the General Assembly authorized the monetary fine *in addition to* the vehicle forfeiture. *See* R.C. 4511.19(G)(1)(c)(iii) and (v). Thus, comparing the monetary fine and the vehicle forfeiture has little bearing on the excessiveness of the forfeiture here. *See Porcelli*, 440 Fed.Appx. at 879, quoting *United States v. Chaplin's, Inc.*, 646 F.3d 846, 855 (11th Cir.2011) (noting that Congress's authorization of both a fine and a forfeiture for an offense suggested that " 'Congress does not consider a punishment somewhat above the statutory fine range to be excessive' "). Had the vehicle forfeiture not been included as a punishment for repeat offenders who chose to drive drunk a third time, the monetary fine may have been greater. But we will never know—the General Assembly chose to authorize a court to order a fine and take away the tool used to commit the crime.

**{¶ 100}** And most importantly, a fine-to-forfeiture ratio-based analysis produces inequitable results by punishing the poor, whose vehicles are likely less valuable, far more heavily than the rich, whose likely more expensive vehicles may be shielded from forfeiture. This factor could support forfeiture of the lower-valued vehicle but preclude forfeiture of the higher-valued vehicle. Such a comparison between a vehicle's value and the separate monetary fine set forth by the General Assembly likely would lead to inconsistent and unfair results.

**{¶ 101}** We cannot separate the monetary fine imposed from the forfeiture of the vehicle. And it is difficult to employ this subjective ratio-based analysis on a case-by-case basis to determine whether a forfeiture is grossly disproportional to the gravity of the offense. Rather, we acknowledge that the General Assembly intended for the offender to be penalized with both, and we look at the penalty as a whole. Therefore, we find a comparison between the fine amount and the value of the forfeiture to be of limited relevance in the gross-disproportionality analysis.

c. Balancing the value of the forfeiture and the gravity of the offense

**{¶ 102}** In balancing the value of the forfeiture and the gravity of the offense, we conclude that O'Malley has not proven by clear and convincing evidence that the forfeiture is grossly disproportional to the gravity of the offense. The legislature chose to punish repeat OVI offenders with the forfeiture of the vehicle that was used in the offense. R.C. 4511.19(G)(1)(c)(v). The legislature's choice of punishment is entitled to significant weight. O'Malley chose to engage in drunk driving for a third time in ten years on one of the busiest travel days of the summer. This too is entitled to weight. Further, although his vehicle was clearly of value and was important to him, he did not demonstrate that the loss of this vehicle would be significant. Though O'Malley was unemployed during the duration of his trial, he is, by all accounts, a young, able-bodied adult. And at the time of the trial court's forfeiture order, O'Malley had few expenses, given that he lived with his grandmother. The value of the vehicle and its importance to

O'Malley are simply not enough to overcome the gravity of the offense. Therefore, O'Malley has not demonstrated that the forfeiture of his $31,000 vehicle was grossly disproportional to his offense.

### III. CONCLUSION

{¶ 103} We hold that the statutory classification contained in R.C. 4511.19(G)(1)(c)(v) does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution or Article I, Section 2 of the Ohio Constitution. And we hold that the forfeiture of O'Malley's 2014 Chevrolet Silverado was not grossly disproportional to his July 2018 OVI offense and that R.C. 4511.19(G)(1)(c)(v) thus is not unconstitutional as applied to O'Malley. Therefore, we affirm the judgment of the Ninth District Court of Appeals.

Judgment affirmed.

O'CONNOR, C.J., and DEWINE and STEWART, JJ., concur.

KENNEDY, J., concurs in judgment only.

DONNELLY, J., dissents, with an opinion joined by BRUNNER, J.

_____

**DONNELLY, J., dissenting.**

{¶ 104} I agree with the majority opinion's rejection of the equal-protection argument of appellant, James O'Malley. But I dissent from the majority's holding that the trial court's order directing the forfeiture of O'Malley's vehicle did not violate the Excessive Fines Clause of the Eighth Amendment to the United States Constitution. Considering the history of this clause and the forfeiture scheme enacted by the legislature under R.C. 4511.19(G)(1)(c)(v) and R.C. 4503.234, I believe that the Excessive Fines Clause prohibits the state from confiscating a defendant's entire net worth for a misdemeanor offense with a maximum fine that is not even one-tenth of the value of the forfeited property, *see* R.C. 4511.19(G)(1)(c)(iii).

{¶ 105} The analysis compels a brief review of O'Malley's financial circumstances and his acquisition of the vehicle at issue here. In 2014, when O'Malley was in his twenties, his grandparents purchased the Chevrolet Silverado truck in question for just under $40,000, and the vehicle was titled in O'Malley's grandfather's name. O'Malley contributed $5,000 to the purchase. O'Malley's grandfather was dying of cancer, and the truck was purchased so that O'Malley could assist his grandparents. The title to the vehicle was put in O'Malley's name in 2015. At the forfeiture hearing in 2019, O'Malley testified that the truck's value was approximately $31,000 and that the vehicle was in "[v]ery good" condition. Additionally, he explained that he had spent almost $5,000 of his own money on improvements to the truck. O'Malley had been working at a factory until his driving-under-the-influence arrest in 2018, and he was unemployed at the time of the forfeiture hearing. His grandfather had died before the hearing, and O'Malley was living with his widowed grandmother on her charity and without meaningful assets of his own.

{¶ 106} While the United States Supreme Court has not provided detailed criteria for determining when a forfeiture violates the Eighth Amendment, it has declared that a forfeiture violates the Excessive Fines Clause if the forfeiture is "grossly disproportional to the gravity of the defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 337, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). Because the vehicle forfeiture ordered in this case was grossly disproportional to the gravity of O'Malley's offense, I would reverse the judgment of the court of appeals and remand the issue of the forfeiture to the trial court for a new calculation of a proportional remedy followed by the sale of the forfeited property with some proceeds returned to O'Malley.

{¶ 107} A forfeiture is a fine. *State v. Hill*, 70 Ohio St.3d 25, 635 N.E.2d 1248 (1994), syllabus. As the majority notes, de novo is the standard of review that we apply in determining the constitutionality of a fine, with no deference to the trial

court's judgment. Majority opinion, ¶ 33; *see also Bajakajian* at 336, fn. 10. The majority is also correct that all statutes enjoy a "strong presumption of constitutionality." *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 25. *"The factual findings made by the [trial] courts in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous.* But the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate." (Internal citation omitted.) *Bajakajian* at 336, fn. 10.

{¶ 108} Here, the court of appeals reviewed the record for error with the limited tools that it had. After all, neither this court nor the United States Supreme Court has been helpful in this area, providing only a philosophy and a general checklist of factors for courts to consider in excessive-fines challenges without delineating the relative importance of these factors or their ultimate limits. *See Timbs v. Indiana*, __ U.S. __, __, 139 S.Ct. 682, 690-691, 203 L.Ed.2d 11 (2019); *Hill* at 34. The majority compounds the problem by performing error correction pursuant to the factors set out by this court in *Hill* at 33-34, rather than providing the parties with a statement of the law. Error correction in this case is not within our jurisdiction. *See* Ohio Constitution, Article IV, Section 2(B)(2)(e) ("The supreme court shall have appellate jurisdiction * * * [i]n cases of public or great general interest * * *); *see also State v. Azeen*, 163 Ohio St.3d 447, 2021-Ohio-1735, 170 N.E.3d 684, ¶ 53 (Stewart, J., dissenting) ("We avoid accepting jurisdiction over cases in which a party is asking this court to review a lower court's application of a settled legal principle to specific facts"). Nor is it what the parties asked us for. O'Malley specifically requested "a guidepost from the Ohio Supreme Court."

{¶ 109} Several rules of statutory construction weigh against the majority's determination. First, the law does not favor forfeitures that operate in derogation

of private-property rights, and a criminal statute imposing such a penalty is to be strictly construed against the state. *See Hill*, 70 Ohio St.3d at 31, 635 N.E.2d 1248. Second, contrary to the opinion of the majority, forfeiture of a vehicle pursuant to R.C. 4511.19(G)(1)(c)(v) and R.C. 4503.234 is not actually "mandatory." *See* majority opinion at ¶ 64, 73. The Eighth Amendment prohibition on excessive fines is a silent component of these statutes. R.C. 4503.234(A) requires that the offender be heard before any forfeiture order is issued, and further, "trial courts should disregard the 'mandatory' language" of the statute. *State v. Ziepfel*, 107 Ohio App.3d 646, 652, 669 N.E.2d 299 (1st Dist.1995).

{¶ 110} Also important to the proportionality analysis is how the state categorizes O'Malley's offense. O'Malley was convicted of one misdemeanor. A misdemeanor is "less serious than a felony." *Black's Law Dictionary* 1196 (11th Ed.2019). The misdemeanor/felony classification has been important in analyzing a person's fitness for firearm ownership. *See, e.g.*, *Binderup v. United States Atty. Gen.*, 836 F.3d 336, 351 (3d Cir.2016), citing *Baldwin v. New York*, 399 U.S. 66, 70, 99 S.Ct. 1886, 26 L.Ed.2d 437 (1970).

{¶ 111} No one disputes that drunk driving is a serious matter. Nevertheless, "a state legislature's classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying [for firearm possession]." *Id.* "[T]he maximum possible punishment is certainly probative of a misdemeanor's seriousness. But [the legislature] may not overlook so generally the misdemeanor label." *Id.* at 352. Here, some of the cases cited by the majority concerning the constitutionality of a forfeiture involved felonies. *E.g.*, *Hill* at 30.

{¶ 112} Judging from the historical pedigree of the Excessive Fines Clause, I conclude that the confiscation of a defendant's sole financial asset in O'Malley's circumstances is an automatic violation of that provision. It recalls England's " 'forfeiture of estate' " of 300 years ago, when the Crown confiscated all the real

and personal property of a felon. Fried, *Criminal Law: Rationalizing Criminal Forfeiture*, 79 J.Crim.L. & Criminology 328, 329 (1988), fn. 1. But here, O'Malley has not committed a felony.

{¶ 113} The United States Supreme Court has quoted William Blackstone on this matter: " '[N]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear * * * .' " (Brackets added in *Timbs*.) *Timbs*, __ U.S. at __, 139 S.Ct. at 688, 203 L.Ed.2d 11, quoting 4 Blackstone, *Commentaries on the Laws of England* 372 (1769). Moreover, the Supreme Court has recognized that the "Magna Carta required that economic sanctions 'be proportioned to the wrong' and 'not be so large as to deprive [an offender] of his livelihood.' " (Brackets added in *Timbs*.) *Id*., quoting *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 271, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). Surely, if the Excessive Fines Clause means anything, it means that the government cannot confiscate a defendant's entire net worth when the maximum fine set by the legislature is less than one-tenth of the value of the forfeited asset.

{¶ 114} Finally, the majority opinion appears to be of two minds when weighing the hardship of high-value forfeitures on the poor as opposed to the wealthy. Regarding *the fine-to-forfeiture component identified in some cases, see e.g., Ziepfel, 107 Ohio App.3d at 653, 669 N.E.2d 299; Bajakajian, 524 U.S. at 339-340, 118 S.Ct. 2028, 141 L.Ed.2d 314,* the majority asserts that overreliance on this factor "produces inequitable results by punishing the poor, whose vehicles are likely less valuable, far more heavily than the rich, whose likely more expensive vehicles may be shielded from forfeiture," majority opinion at ¶ 100. And yet, the majority today applies the statute to confiscate a poor man's entire fortune, such as it is—a fate not even remotely threatening the wealthy.

{¶ 115} Furthermore, numerous commentators have linked high fines with exacerbated economic inequality. *See, e.g*., Llorente, *Criminalizing Poverty*

*Through Fines, Fees, and Costs*, American Bar Association (Oct. 3, 2016), https://www.americanbar.org/groups/litigation/committees/childrens-rights/article s/2016/criminalizing-poverty-fines-fees-costs/?q=&fq=(id%3A%5C%2Fcontent %2Faba-cms-dotorg%2Fen%2Fgroups%2Flitigation%2F*)&wt=json&start=0 (accessed Aug. 11, 2022) [https://perma.cc/C9DU-QDP3]; Pager, Goldstein, Ho, & Western, *Criminalizing Poverty: The Consequences of Court Fees in a Randomized Experiment*, American Sociological Review (Feb. 20, 2022), https://journals.sagepub.com/doi/full/10.1177/00031224221075783 (accessed Aug. 11, 2022) [https://perma.cc/RU3N-9B2U]. The poor find escaping the criminal-justice system difficult because of these penalties.

{¶ 116} But that is not the worst news. Studies have shown that these high fines do not deter crime. The "requisite certainty of punishment," not high fines, is most likely to deter crime. Fried, 79 J.Crim.L. & Criminology at 368; *see also* Wright, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* (Nov. 19, 2010), https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/#:~:text=An%20analysis%20of%20the%20deterrent,additional%20effect%20on%20deterring%20crime (accessed Aug. 15, 2022) [https://perma.cc/8MKE-2JHD] ("increases in the *certainty* of punishment, as opposed to the *severity* of punishment, are more likely to produce deterrent benefits" [emphasis sic]). Steep penalties like this one are likely to increase recidivism. "When overwhelmed by financial distress and feelings of despair, petty thefts, drug sales, robberies, and relapse to substance use may become compelling survival strategies." Pager, Goldstein, Ho, & Western, American Sociological Review at 3.

{¶ 117} In addition to being counterproductive, the forfeiture here is grossly disproportional to the gravity of the offense. *See Bajakajian*, 524 U.S. at 336-337, 118 S.Ct. 2028, 141 L.Ed.2d 314. Because I would hold that the Excessive Fines

Clause prohibits the state from confiscating a defendant's entire net worth for a misdemeanor offense with a maximum fine that is not even one-tenth of the amount forfeited, I dissent.

BRUNNER, J., concurs in the foregoing opinion.

————————————

J. Matthew Lanier, City of Brunswick Prosecutor, and Kenneth J. Fischer, City of Brunswick Law Director, for appellee.

Ronald A. Annotico, for appellant.

Elizabeth Bonham and Freda J. Levenson, urging reversal for amicus curiae, ACLU of Ohio Foundation, Inc.

————————————